STATE of Tennessee, Appellee,

v.

James A. BREWER and C. Donald
Frost, Appellants.

Court of Criminal Appeals of Tennessee,
at Nashville.

Feb. 13, 1996.

2

Lucien Dale, Nashville, for appellant, Brewer.

David L. Raybin, Hollins, Wagster & Yarbrough, P.C., Nashville, for appellant, Frost.

Charles W. Burson, Attorney General, Byron M. Jones, Assistant Attorney General, Victor S. Johnson, III, District Attorney General, Paul DeWitt, Byron M. Jones, Asst. Dist. Attorneys General, Nashville, for appellee.

## *OPINION*

SCOTT, Presiding Judge.

The appellant James A. Brewer was convicted of fourteen counts and the appellant C. Donald Frost of sixteen counts, respectively, of violating the securities laws of the State of Tennessee. Both appellants were also convicted of four counts of obtaining money by false pretenses. Each appellant received an effective sentence of seven and one half years, being ordered to serve one hundred days in confinement in the Davidson County Workhouse with the balance of the sentences to be served on probation. The appellant Brewer was ordered to pay fines in the sum of $3,600.00 and the appellant Frost was ordered to pay fines in the sum of $4,200.00. In addition, both appellants were required to perform two hundred fifty hours of community service work and to make restitution to the victims of their crimes.

In this appeal, the appellants raise the following issues:

(1) Whether the trial court properly instructed the jury concerning the definition of an "investment contract" under the Tennessee Securities Act;

(2) Whether the trial court's instructions to the jury in defining an "investment contract" violated the appellant Frost's due process rights;

(3) Whether the trial court erred in refusing to dismiss the indictment on the ground that the Tennessee Securities Act of 1980 as codified in Title 48, Chapter 2 of the Tennessee Code Annotated is unconstitutionally ambiguous, thereby denying the appellant Brewer of his right to a fair trial;

(4) Whether the trial court properly charged the jury on the elements of the offense of misrepresenting or omitting material facts in connection with the sale of a security;

(5) Whether the trial court properly prevented the appellants from presenting a defense based upon a good faith reliance on the advice of counsel that the enterprise was not subject to securities laws;

(6) Whether the trial court erred in its refusal to bifurcate the trial in the lower court;

(7) Whether the evidence adduced at trial was sufficient to sustain the jury's determination that the appellant Frost was guilty of obtaining money by means of false pretenses;

(8) Whether the evidence adduced at trial was sufficient to sustain the jury's determination that the appellant Frost was guilty of fraud in the sale of securities to Faron Young;

(9) Whether the convictions on all of the counts other than Count One merged with Count One;

(10) Whether the trial court erred in permitting the State to introduce evidence of the appellant Frost's prior criminal conviction and civil injunctions levied against him;

(11) Whether the trial court erred in failing to require the state to disclose to the appellant Frost certain statements made by witnesses for the State which were potentially exculpatory;

(12) Whether the trial court improperly failed to grant a mistrial due to the introduction of testimony concerning a recent bankruptcy by the appellant Frost;

(13) Whether testimony that an individual named Mr. Stanley had made threats of physical violence toward one of the victims in this case was irrelevant and unduly prejudicial to the appellant Frost;

(14) Whether the combination of errors which occurred in the lower court denied the appellant Frost a fair trial.

## FACTS

In September of 1987, appellants and others undertook to establish a private wholesale store, whereby the initial capital for purchasing and stocking the building was to be secured by the selling of items of merchandise to individuals who sought to join their wholesale club. After consulting with an attorney as to the legality of the business under Tennessee law, a corporate charter was secured for the enterprise under the name "U.S.A. Wholesale Club, Inc." The appellant Brewer was the president and a director of the corporation. The appellant Frost was the national sales director of the corporation. At the time the business was terminated, each appellant owned 27.5% of the corporation's stock.

Prior to beginning the enterprise, the appellants consulted with an attorney regarding the legality of their proposed business under Tennessee law.[1] They were advised that the venture would not violate the Tennessee Consumer Protection Act, but were not advised concerning securities laws because the attorney did not believe that the appellant's proposed business activity involved securities. The appellants testified that they relied upon this advice in deciding to engage in the enterprise.

The appellants planned to initially establish a wholesale store in Nashville and then expand by opening stores in Memphis, Knoxville, Chattanooga, and Jackson. The Nashville, Knoxville, and Memphis stores were to be limited to 6,500 associate and executive members and the Jackson and Chattanooga stores were to be limited to 5,500 associate and executive members. The appellants told prospective members that they planned to

---

1. The appellants previously had encountered regulatory or legal difficulties in the form of cease and desist orders, civil injunctions, and criminal convictions for operating similar enterprises in four other states, to-wit: Ohio, Florida, Texas, and Oklahoma.

eventually open one hundred stores across the country.

To raise the initial capital necessary for the opening of the store in Nashville, the appellants and others began to hold promotional meetings in which they sold specialty products and attempted to convince individuals to join the club. The specialty products included a water purification system, cookware, a vacuum cleaner, various items of jewelry, and other items. The price of these products as offered to the public varied at times but was announced, at least initially, as $995.00 per item. However, each product had a wholesale value of approximately two hundred dollars.[2] The proceeds from the sale of each $995.00 product was distributed as follows: $438.00 went for operating expenses, $182.00 went to "overrides," $175.00 went to commissions, and approximately $200.00 went to cover the cost of the product.

The appellants told potential purchasers that the price of the specialty products had been greatly marked up in order to facilitate the purchase of a building and inventory for the wholesale store. Individuals could become members of the club through facilitating the sale of specialty products by inviting their friends to sales meetings conducted by the appellants[3] or by purchasing the products themselves.[4] The motivating factors for becoming a member of the club were the attainment of (a) commissions from the sale of specialty products to individuals that the member brought to the sales meetings and (b) the right to distribute buyer cards to be used at the wholesale store when it opened.

The appellants told potential members that the buyer cards distributed by a member would entitle that member to a commission on every item purchased at the wholesale store with one of the cards. The potential for hard working members to make enormous commissions was heavily stressed.[5]

The program had three levels of participation. The first level, called a "temporary associate," was obtained by a person who registered with the club by paying a twenty-five dollar fee and began attending training meetings. Once a temporary associate either brought a guest to a meeting who then purchased a specialty product or the temporary associate himself bought a specialty product under a fabricated name, he became locked in as one of the 6,500 "permanent associates." Permanent associates were entitled to receive a one hundred dollar commission on the sale of any specialty product to an individual the associate invited to a sales meeting. In addition, permanent associates were to receive twenty-five buyer cards which they could distribute to family members, friends, and others. Once the wholesale store opened, permanent associates were to receive a four percent commission on all merchandise sold to a holder of one of their buyer cards.

Once five specialty product sales were credited to a permanent associate, the associate was upgraded to "executive member" status. Executive members of the club were to receive commission in the amount of $175.00 on the sale of any specialty product to one of their invitees. They also were to receive a $75.00 commission on sales of any

---

2. Records furnished to an investigator for the enforcement section of the Securities Division of the State of Tennessee revealed that the water purifier cost U.S.A. Wholesale Club $181.85. The vacuum cleaner cost ranged from $216.00 to $220.00 and the cookware cost ranged from $206.96 to $220.00. Evidence of the actual price paid by U.S.A. Wholesale Club for other specialty products was not introduced at trial.

3. In their attempts to become a member of the club, individuals were only required to bring guests to the meetings. The appellants were responsible for all of the marketing of the specialty products. This principle also applied to members who invited potential buyers to sales meetings.

4. Although individuals could not become members of the club by purchasing specialty products in their own name, several individuals were told that they could evade this rule by simply making up a hypothetical name under which they could purchase the product.

5. Potential members were told that they could work diligently for one year and then retire, that some members would become millionaires, and that a member could make $500,000.00 per year just by bringing in more potential buyers than any other member for one month.

specialty products made to individuals invited to club sales meetings by any associate member in their sales organization. Moreover, executive members were entitled to receive more buyer cards than permanent associates. Finally, they were to earn a six percent commission on all merchandise purchased at the wholesale store by a holder of one of their buyer cards and a two percent commission on all store sales to holders of buyer cards distributed by permanent associates within their organization.

Although some members of U.S.A. Wholesale Club were pleased with the enterprise, many others were not. Some members testified that they never received commissions that they were due from their sales. Others testified that the appellants had misrepresented information about the enterprise and failed to disclose certain material information about their past business activities. The facts of several of these misrepresentations merit more detailed explanation.

First, the appellants told people at sales meetings that a substantial portion of the purchase price of the specialty products would be set aside for the acquisition of a building and inventory. Securities Division investigators subsequently discovered that those statements were untrue. Bank records revealed that the appellants had deposited $758,436.00 into the wholesale club's corporate account and had withdrawn $756,000.00 therefrom.[6]

There was also evidence at trial that the appellants made several misrepresentations concerning the old John F. Lawhon building which was supposed to be the location of the wholesale store. For example, one witness testified that the appellant Frost told her that certain supporters of the wholesale club, namely country music artist Faron Young and an individual from Texas, would purchase the building for the store and pay the utilities. The witness further testified that

the appellant Frost represented to her that an inventory of refrigerators for the wholesale store was in the upstairs of the old Lawhon building. Another witness testified that she was told at a sales meeting in August 1988 that U.S.A. Wholesale Club owned the old Lawhon building. Moreover, even when the appellants did disclose at some of the sales meetings that they had only contracted to purchase the building, they still failed to disclose that they did not have the requisite capital to close the purchase or that the earnest money for the purchase had to be borrowed.[7] Further evidence adduced at trial revealed that U.S.A. Wholesale Club never owned the building, had the financial resources to purchase it, or had particular investors who were willing to purchase the building for the club.

The appellants also represented at sales meetings that they had experienced prosperity with similar wholesale club enterprises in other states. As an example of their prior successes, the appellants often showed a film that depicted a successful wholesale club store in Ohio with which they were involved. Although there was some testimony at trial that the appellants acknowledged that they had incurred some "problems" with the Ohio store and that it was no longer in operation, numerous witnesses testified that they were never told about any of the cease and desist orders, civil injunctions, bankruptcies, or criminal convictions that arose out of their ventures in other states, including Ohio.[8]

The remaining evidence of misrepresentations can be discussed more briefly. First, in the promotion of their company, the appellants represented that country music artist Faron Young was a member of the board of directors of the corporation. At trial, however, Mr. Young testified that he refused to become a director when he was offered

---

**6.** One witness, who was employed as a controller at U.S.A. Wholesale Club, testified that the appellant Frost refused his suggestion that a separate account be established to hold the purchase money for the wholesale store.

**7.** The failure to disclose this information is relevant, in that, the appellants routinely represented

at sales meetings that a significant portion of the purchase price of the specialty products was being set aside for the purchase of the building for the wholesale store.

**8.** *See supra* note one.

the position.[9] Second, at a sales meeting around the beginning of the summer in 1988, the appellant Frost stated to members and guests that U.S.A. Wholesale Club had three million dollars in commissions to pay out before Christmas of that year. Bank records introduced at trial showed that the total funds of the company never amounted to a sum approaching three million dollars. Lastly, there was testimony at trial to the effect that the appellant Frost stated at sales meetings that the wholesale store would be able to offer lower prices than its competitors because it would be able to acquire inventory at reduced costs and avoid financing charges by paying cash for the inventory. He stated that the necessary capital for these inventory purchases would come from funds which were derived from sales of specialty products. Bank records, however, showed that no funds had been set aside for the acquisition of inventory and that the general corporate account had been exhausted almost entirely by the time business activities terminated.

In or shortly before July 1988, the Securities Division of the State of Tennessee initiated an investigation regarding the legitimacy of the club. On September 2, 1988, the Tennessee Commissioner of Commerce and Insurance issued an administrative order finding that the appellants' activities in connection with U.S.A. Wholesale Club constituted the sale of unregistered securities under the Tennessee Securities Act and ordered that they cease such activities until they were registered as required by the Act. Subsequently, the appellants continued with their usual business practices and continued to make sales in violation of the administrative order. The matter was referred by the Securities Division to the District Attorney for prosecution on April 27, 1989. This appeal was taken from the prosecution and convictions which thereafter resulted.

## I

The appellants' initial contention in this appeal is that the trial court improperly instructed the jury concerning the definition of an "investment contract" under the Tennessee Securities Act of 1980 and that such error constituted reversible error. We disagree.[10]

At the outset we note that the appellant Frost argued at trial that an "investment contract" should be defined in accordance with the test stated in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1946). Application of this test was rejected by the trial court. Now on appeal the appellant Frost, in challenging the trial court's definition, argues that the appropriate definition is stated by the *Howey* test as modified in *United States Hous. Found. v. Forman*, 421 U.S. 837, 860–66, 95 S.Ct. 2051, 2064–67, 44 L.Ed.2d 621 (1975). The elements and practical applications of the strict *Howey* test and the so-called *Howey–Forman* test are not synonymous and, therefore, constitute separate theories.

■ "An appellant cannot change theories from the trial court to the appellate court." *State v. Banes*, 874 S.W.2d 73, 82 (Tenn. Crim.App.1993); *accord State v. Matthews*, 805 S.W.2d 776, 781 (Tenn.Crim.App.1990); *State v. Aucoin*, 756 S.W.2d 705, 709 (Tenn. Crim.App.1988). Such action constitutes waiver. *State v. Gregory*, 862 S.W.2d 574, 578 (Tenn.Crim.App.1993) (citations omitted). However, even if the issue was not waived, we would still find no reversible error in the trial court's instruction to the jury concerning investment contracts.

Sixteen of the twenty-one counts in the indictment charge the appellants with various

9. Mr. Young testified that when he saw his photograph in a promotional brochure wherein he was identified as a director, he questioned how that occurred and was told that he was elected by the other principals.

10. Although the appellant Brewer lists the trial court's definition of "investment contract" as an issue on appeal in his brief, he has failed to proffer any argument whatsoever in conjunction with the issue. Therefore, the issue is waived and shall not be considered further in regard to the appellant Brewer. *See State v. Killebrew*, 760 S.W.2d 228, 231 (Tenn.Crim.App.1988); *State v. Smith*, 735 S.W.2d 831, 836 (Tenn.Crim.App. 1987); Tenn.R.App.Proc. 27(a)(7); Tenn.Ct.Crim. App.R. 10(b).

violations of the securities laws. The Tennessee Securities Act defines a "security" as:

(A)ny note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, **investment contract,** voting-trust certificate, certificate of deposit for a security, certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

Tenn.Code Ann. § 48–2–102(12) (emphasis added). Thus there is no question that an "investment contract" is a "security." The question remains, however, as to what constitutes an "investment contract." This issue is one of first impression in this State given that neither the legislature nor the judiciary has previously promulgated a definition.

■ This Court is not without some guidance in its endeavor to formulate a definition. In *DeWees v. State,* 216 Tenn. 104, 106, 390 S.W.2d 241, 242 (1965), the Supreme Court of Tennessee stated that the securities laws of this State "are remedial in character, designed to prevent frauds and impositions upon the public." The Court further stated that the securities acts should be construed liberally so as to effectuate the espoused purposes which underlie the acts. *Id.* It is from this mandated perspective that we examine this issue.

In the pursuance of a definition of "investment contract" at trial, both appellants argued for the application of the so-called strict *Howey* test, whereas the State advocated usage of the *Howey–Forman* test. After fully reviewing these standards, the trial court rejected both and adopted a definition espoused by the Hawaii Supreme Court. We will consider each of the definitions.

## A. The Development of a Definition

■ Considerable scholarly debate has ensued concerning the proper definition of an investment contract security. In *SEC v. W.J. Howey Co.,* the United States Supreme Court, interpreting section 2(1) of the Securities Act of 1933, 15 U.S.C. § 77b(1), proffered the following definition:

[A]n investment contract ... means a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party ... The test is whether the scheme involves [1] an investment of money [2] in a common enterprise [3] with profits [4] to come solely from the efforts of others. If that test be satisfied, it is immaterial whether the enterprise is speculative or nonspeculative or whether there is a sale of property with or without intrinsic value.

328 U.S. at 301, 66 S.Ct. at 1104. For a period, this rule was strictly applied not only by all federal courts, but also by several state courts. *E.g., Georgia Market Centers, Inc. v. Fortson,* 225 Ga. 854, 171 S.E.2d 620, 623–24 (1969); *Gallion v. Alabama Market Centers, Inc.,* 213 So.2d 841, 845–46 (Ala.1968).[11]

In subsequent years, the *Howey* test was criticized by both courts and scholars as being too rigid and thus easily circumvented. *See e.g., SEC v. Koscot Inter., Inc.,* 497 F.2d 473, 479–84 (5th Cir.1974); *SEC v. Glenn W. Turner Ent., Inc.,* 474 F.2d 476, 482 (9th Cir.1973); *State v. Hawaii Market Center,* 52 Haw. 642, 485 P.2d 105, 108 (1971); 2 Louis Loss & Joel Seligman, *Securities Regulation* 942–43 (3d ed. 1989). Most of the scrutiny and criticism concerned *Howey*'s requirements that profits be derived "solely" from the efforts of others and that a "common enterprise" had to exist.

In *State v. Hawaii Market Center, Inc.,* supra, the Hawaii Supreme Court became one of the first courts to openly criticize the *Howey* test and reject strict application of it. The case involved a business enterprise that was substantially similar to the one now before this Court. In that case a corporation

11. Both of those states subsequently rejected strict application of the *Howey* test. Ga.Code Ann. § 10–5–2(26) (Michie 1994); *Burke v. State,* 385 So.2d 648, 651–52 (Ala.1980).

was formed for the express purpose of opening a retail store which would sell merchandise only to persons possessing purchase authorization cards. *Hawaii Market*, 485 P.2d at 107. In order to generate financing for the enterprise, the corporation recruited "founder-members," with the maximum number of such members being set at five thousand. *Id.*

Prospective founder-members were asked to attend recruitment meetings where a speaker explained how members would be eligible to earn (1) immediate income before the store became operational, and (2) future income after the store became operational. *Id.* Members were to earn income in a variety of ways, including commissions based upon bringing in new members or the purchase of items at the retail store with a purchase authorization card given out by the member. *Id.* A person became a founder-member by purchasing from the corporation either a sewing machine or cookware, each with a wholesale value of $70.00, for $320.00. *Id.*

Declining to apply the *Howey* test, the Hawaii Supreme Court noted that "[t]he primary weakness with the *Howey* formula is that it has led courts to analy[z]e investment projects mechanically, based on a narrow concept of investor participation." *Id.* 485 P.2d at 108. The Court went on to state that the fulfillment of the purposes of the securities laws "requires that courts focus their attention on the economic realities of security transactions . . ." *Id.* at 109 (citing *State v. Gopher Tire & Rubber Co.*, 146 Minn. 52, 56, 177 N.W. 937, 938 (1920)). In attempting to accomplish this goal, the Court developed two theories for extending *Howey*. *See* Loss & Seligman, *supra*, at 972–73.

One method employed by the Hawaii Supreme Court was to interpret the "solely" part of the *Howey* definition as referring to the "managerial" efforts of the franchisor or member. *Hawaii Market*, 485 P.2d at 108. The court found that since *Howey* involved "no actual investor participation," the United States Supreme Court had "not yet decided whether an investment plan involving non-managerial investor participation" would also be encompassed by the concept of an invest-

ment contract security. *Id.* at 108 n. 3. In this respect, the court was not actually rejecting this prong of *Howey*.

The second procedure the Hawaii court utilized for extending *Howey* was the introduction of concepts from the risk capital theory which originated with the California Supreme Court in an opinion authored by Justice Roger Traynor. *See Silver Hills Country Club v. Sobieski*, 55 Cal.2d 811, 815, 13 Cal.Rptr. 186, 188, 361 P.2d 906, 908–09 (1961). Under the risk capital test the focus is not so much on whether the investors derive their profits solely from the efforts of others, but rather on whether the promoter is relying on the investors for a substantial portion of the initial capital necessary to launch the enterprise. *State v. Consumer Business Sys., Inc.*, 5 Or.App. 19, 482 P.2d 549, 555 (1971). In discussing this theory, the Hawaii court stated that the "subjection of the investor's money to the risks of an enterprise over which he exerts no managerial control is the basic economic reality of a security transaction." *Hawaii Market*, 485 P.2d at 109, citing Coffey, The Economic Realities of a "Security": Is There a More Meaningful Formula? 18 W.Res.L.Rev. 367, 412 (1967).

Attempting to establish a flexible formula which would protect the public from the vast array of alluring investment schemes, the court held that an "investment contract," and thence a "security," exists when:

> (1) An offeree furnishes initial value to an offeror, and (2) a portion of this initial value is subjected to the risks of the enterprise, and (3) the furnishing of the initial value is induced by the offeror's promises or representations which give rise to a reasonable understanding that a valuable benefit of some kind, over and above the initial value, will accrue to the offeree as a result of the operation of the enterprise, and (4) the offeree does not receive the right to exercise practical and actual control over the managerial decisions of the enterprise.

*Id.* Under the facts of the case, the Hawaii court found that the business enterprise and the attendant agreements between the corporation and the founder-members constituted

an investment contract. In reaching this conclusion the court stated:

> The terms of the offer and the inducements held out to the prospects clearly indicate that the substantial premiums paid by founder-members to [the corporation] are given in consideration for the right to receive future income from the corporation. These overcharges constitute the offerees' investments or contributions of initial value, such value being subjected to the risks of the enterprise.
>
> It is uncontested that the recruitment of founder-members was motivated by the need to raise capital to finance the opening of the proposed [members-only retail] store. Inextricably bound to the success of this enterprise is the ability of the founder-members to recoup their initial investment and earn income. The recruitment fee paid to distributors and supervisors, during the pre-operational phase of the plan, rests upon the promoters' ability to sell the success of the plan to prospective members. In addition, those members who choose to rely solely on the second method of earning income, the payment of commissions based on sales, receive no return at all on their investment unless the store functions successfully.... [S]ince membership is limited to five thousand, a very large percentage of founder-members will be totally dependent on sales commissions to recover their initial investment plus income. It is thus apparent that the security of the founder-members' investments is inseparable from the risks of the enterprise. The success of the plan is the common "thread on which everybody's beads [are] strung."

*Id.* at 110. "In order to negate the finding of a security the offeree should have practical and actual control over the managerial decisions of the enterprise. For it is this control which gives the offeree the opportunity to safeguard his investment, thus obviating the need for state intervention." *Id.*, at 111, citing Coffey, supra, at 396–98. In addition, founder-members had none of "the indicia of managerial control which would preclude the finding of a security" and allow them to "influence the utilization of the accumulated capital" or exercise any authority over the operation of the proposed retail store. *Id.* at 111.

A few years after the *Hawaii Market* decision, the United States Supreme Court revisited the question of what constitutes an investment contract under federal security laws in *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). The Court emphasized that, in searching for the meaning and scope of the word "security," "form" should be disregarded in favor of "substance" with the focus being placed on the "economic reality" of the transaction. *Id.* 421 U.S. at 848, 95 S.Ct. at 2058; citing *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *See Union Planters Nat'l Bank v. Commercial Credit Bus. Loans, Inc.*, 651 F.2d 1174, 1180 (6th Cir.1981). Apparently realizing that its earlier pronouncement was too rigid, the Court undertook to refine the *Howey* test.

To this end, the Court stated that "[t]he touchstone is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the *entrepreneurial or managerial efforts* of others." *Forman*, 421 U.S. at 852, 95 S.Ct. at 2060 (emphasis added). This language effectively deleted the strict "solely" requirement from the test [12] in much the same manner as the Hawaii Supreme Court did.

---

12. A year prior to the *Forman* decision, the Fifth Circuit Court of Appeals, referring to the "solely" requirement of *Howey* held that "[a] literal application of the *Howey* test would frustrate the remedial purposes of the [federal Securities] Act." *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 480 (5th Cir.1974). The Court emphasized that "[t]he securities laws are intended to protect investors not merely to test the ingenuity of sophisticated corporate counsel." *Id.* Moreover, in footnote sixteen of the *Forman* opinion the Supreme Court expressly referenced *SEC v. Glenn W. Turner Enterprises*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973), but "express(ed) no view, ... as to the holding" of *Turner*. In *Turner*, the Ninth Circuit held that the word "solely" should not be read as "a strict or literal interpretation on the definition of an investment contract, but must be construed realistically, so as to include within the definition those schemes

### B. The Appropriate Definition of "Investment Contract"

From our review of the case law of other jurisdictions, it appears that the *Howey–Forman* test is the majority rule in the United States. However, the definition pronounced in *Hawaii Market* is also not without support. Its combined *Howey* -risk capital test, or forms substantially similar thereto, has been adopted by at least seventeen jurisdictions.[13] In his treatise on state securities laws, Professor Long states that "it is arguable that this test will eventually replace *Howey[-Forman]* as the leading test for investment contracts, at least at the state level." Joseph C. Long, *Blue Sky Law* § 2.04(4), at 2–146 (1992). In addition, the United States Securities and Exchange Commission has also expressed approval of the combined *Howey* -risk capital formula as applied in *Hawaii Market*. *See* Applicability of the Securities Laws to Multi-level Distributorship and Pyramid Sales Plans, Securities Act Release No. 33–5211, 36 Fed.Reg. 23289, 17 C.F.R. § 231.5211, Fed.Sec.L.Rep. (CCH) ¶ 1048 (Nov. 30, 1971).

Citing *Stanley v. Commercial Courier Serv., Inc.*, 411 F.Supp. 818, 822–23 (D.Oreg.1975) as an illustrative case, the appellant Frost contends that the test in *Hawaii Market* is far broader than the *Howey–Forman* formula. Although the *Stanley* court did find that the tests were not "synonymous," it also stated that the risk capital test and the *Howey–Forman* test "are essentially the same." The court further stated that "the key to investment contracts under either approach is whether the investor remains a 'master of his own destiny' or whether he relinquishes the 'practical and actual control over the managerial decisions of the enterprise' to others." *Id.* at 823.[14] This point is particularly significant given that the *Hawaii Market* formula is a hybrid test, combining both elements of the *Howey* and risk capital tests. In short, *Stanley* does not buttress the appellant Frost's contention that the *Hawaii Market* definition is "far broader" in scope than *Howey–Forman*. Moreover, some courts and commentators have suggested that the tests are not exclusive, but complimentary and alternative. *People v. Graham*, 163 Cal.App.3d 1159, 210 Cal. Rptr. 318, 325 n. 12 (1985); *see also State v. Consumer Bus. Sys., Inc.*, 5 Or.App. 19, 482 P.2d 549, 554 (1971).

The first prong of the *Hawaii Market* test is nothing more than the investment concept of the *Howey–Forman* test. The second prong adopts the concept of risk capital, whereas *Howey–Forman* focuses on the existence of a common venture, i.e., vertical or horizontal commonality.[15] The third prong

---

which involve in substance, if not in form, securities."

**13.** The hybrid *Howey*-risk capital test has been adopted by judicial decision in at least six jurisdictions. *See, e.g., Casali v. Schultz*, 292 Ark. 602, 732 S.W.2d 836 (1987); *People v. Graham*, 163 Cal.App.3d 1159, 210 Cal.Rptr. 318 (1985); *Securities Administrator v. College Assistance Plan, Inc.*, 533 F.Supp. 118 (D. Guam 1981), *aff'd*, 700 F.2d 548 (9th Cir.1983); *State v. Hawaii Market Center*, 52 Haw. 642, 485 P.2d 105 (1971); *State v. George*, 50 Ohio App.2d 297, 362 N.E.2d 1223 (1975); *Pratt v. Kross*, 276 Or. 483, 555 P.2d 765 (1976).

At least six states have adopted the test by statute. *See* Alaska Stat. § 45.55.130(12) (1980); Ga.Code Ann. § 10–5–2(26) (1981); Mich.Comp. Laws § 451.801(1); N.D.Cent. Code § 10–04–02(12) (1985); Okla.Stat. tit. 71, § 2(20)(P) (1981); Wash.Rev.Code § 21.20.005(12) (1979).

At least five states have adopted the test by regulatory rule. *See* 14 Ill.Reg. § 130.200 (1984); N.M. Sec. Bureau Reg. 603(D) (1984); N.C.Admin.Code tit. 18, r. 6. 1104(h)(2) (1984); Wis.Admin.Code § 1.02(6) (1984); Wyo. Sec. Div. Reg. Ch. II, § 4(b) (1986).

**14.** The first phrase quoted by the *Stanley* court is from *Mitzner v. Cardet Int'l, Inc.*, 358 F.Supp. 1262, 1268 (N.D.Ill.1973) which used a *Howey–Forman* test, the second quoted phrase is from *Hawaii Market*, 485 P.2d at 109.

**15.** The concept of risk capital, simply put, is the public solicitation of capital from investors which will be subject to the risks of the enterprise. *Hawaii Market*, 485 P.2d at 109. Conversely, "[a] common enterprise involving vertical commonality is one in which the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment of third parties.... It requires only that the investor and the promoter be involved in some common venture without requiring the involvement of other investors.... A horizontal common enterprise, on the other hand, requires a heightened degree of affiliation. Horizontal commonality ties the fortunes of each investor to the success of the overall venture." *Union Plant-*

of *Hawaii Market* utilizes the more liberal concept of the expectation to receive a "benefit" instead of the slightly more restrictive concept of "profits" found in *Howey–Forman*. Lastly, the fourth prong makes explicit, in layman's terms, the *Howey–Forman* principle that the investor exercises no managerial control. The similarity in scope of the two tests is evident.

The *DeWees v. State,* supra, mandate to liberally construe the securities laws in order to protect the public is, standing alone, very persuasive authority for the adoption of the ·slightly more liberal combined *Howey*-risk capital test enunciated in *Hawaii Market,* 485 P.2d at 109. Moreover, this test will better effectuate the remedial purpose of the security laws, namely the protection of the public from frauds and impositions. *Id.,* manifested not only in the obvious and commonplace but in "the countless and variable schemes devised by those who seek the money of others on the promise of profits." *Howey,* 328 U.S. at 299, 66 S.Ct. at 1103. Finally, the test provides detailed statements of its elements in laymen's terms which can only serve to promote the proper administration of justice by the jury.

Accordingly, we hold that the trial court properly instructed the jury concerning the definition of an investment contract under Tenn.Code Ann. § 48–2–102(12). We commend the trial court in taking this action of instructing the jury in light of the fact that "simply reading a statute to a jury when the statute contains words requiring clarification does not satisfy 'the demands of justice' or the defendant's constitutional right to trial by jury." *State v. Teel,* 793 S.W.2d 236, 249 (Tenn.1990) (partially quoting *State v. McAfee,* 737 S.W.2d 304, 308 (Tenn.Crim.App. 1987)). Finally, we find that the jury properly applied the *Howey*-risk capital test, as stated in *Hawaii Market* to the facts and circumstances of this case.

## II

■ The appellant Frost argues that, even assuming the *Howey*-risk capital test as stated in *Hawaii Market,* 485 P.2d at 109, is the appropriate standard, the application of the test to him in this case violated his due process rights. He points out that no Tennessee case has ever "hinted" that the *Howey*-risk capital test would be adopted in Tennessee and asserts that, conversely, *State v. Burrow,* 769 S.W.2d 510 (Tenn.Crim.App. 1989), suggests that the *Howey–Forman* test should be adopted. Based on these contentions, the appellant Frost claims that he did not have fair notice that an investment contract would be defined so broadly and, thus, no notice that his actions were criminal. *See generally State v. Schimpf,* 782 S.W.2d 186, 189 (Tenn.Crim.App.1989).

The appellant Frost's position is flawed. Although it is true that no case from this State has ever specifically suggested that the *Howey*-risk capital test formulated in *Hawaii Market* would be adopted, *DeWees,* 216 Tenn. at 106, 390 S.W.2d at 242, made it clear that the securities laws would be interpreted liberally by the courts. Furthermore, we find that *Burrow* in no shape, form, or fashion implied that Tennessee would follow the *Howey–Forman* test. There this Court held that whether a transaction involves the sale of a "security" is a question to be determined by the finder of fact, *Burrow,* 769 S.W.2d at 513, without addressing the issue of how an investment contract should be defined.

Other jurisdictions have found that the broadening of the definition of an investment contract does not violate the due process rights of the offender. *E.g., State v. Duncan,* 181 Mont. 382, 593 P.2d 1026, 1033 (1979). In addition, the appellant Frost was particularly aware that many states have begun to adopt more liberal definitions for investment contracts in view of the fact that the *Howey*-risk capital test adopted in this case has previously been applied against him in *Peltier v. Consumer Companies of America,* et al, Court of Common Pleas, Franklin County, Ohio, March 31, 1977, wherein the appellant Frost was one of thirteen defendants enjoined from "any future sales of investment contracts" or "any further viola-

ers *Nat. Bank v. Commercial Credit,* 651 F.2d 1174, 1183 (6th Cir.1981); *see Deckebach v. La*

*Vida Charters, Inc. of Florida,* 867 F.2d 278, 281–82 (6th Cir.1989).

tions of the Ohio Securities Act, Chapter 1707 R.C."

■ We further find that the absence of a statutory or common law definition of an investment contract at the time the offenses were committed does not render Tenn.Code Ann. § 48–2–102(12) unconstitutionally vague.[16] In *Burrow*, this Court stated:

> Finally, Mr. Ward contends that the term "security" is so vague that dismissal of the charges is required. He contends that the dearth of Tennessee cases interpreting the term requires dismissal.
>
> We note that there are numerous cases from other jurisdictions, both state and federal, cited in the briefs of the parties interpreting various statutory definitions of the term "security." The fact that there are no Tennessee cases does not preclude the prosecution of the appellees for alleged violations of the statutes. It is only after someone is prosecuted that the appellate courts have the opportunity to write opinions interpreting the statutes. Taken to its logical extreme, this argument would produce a "Catch 22" situation that would preclude the prosecution of anyone under any new criminal statute, since no one could be prosecuted until the statute was interpreted and the statute could not be interpreted until someone was prosecuted.

*Id.* at 514.

Given the facts and circumstances of this case and these particular appellants, we find that there was no impingement upon the due process rights of either of the appellants. Therefore, this issue is without merit.

### III

■ The appellant Brewer asserts that the trial judge erroneously refused to include in his instructions to the jury the language in the definition of a security which excludes "a note or other evidence of indebtedness issued in a mercantile or consumer, rather than an investment, transaction." *See* Tenn.Code Ann. § 48–2–102(12)(C). He contends that the ordinary construction of the Tennessee

Securities Act in defining an investment contract would have to consider the "debt factor." Based upon the record in this case, we disagree.

For the sake of context, we mention that the definition of a security under the Tennessee Securities Act includes any "note" or "evidence of indebtedness" unless it was "issued in a mercantile or consumer, rather than an investment, transaction." *See Id.* at § 48–2–102(12). This exclusion is simply the codification of a long recognized distinction between notes issued in the context of an investment and those issued to finance the purchase of mercantile or consumer goods.

The difficulty with the appellant Brewer's argument, however, is that this exclusion is inapposite to the facts of the present case. The State charged the appellants with selling "investment contracts," not "notes" or "evidences of indebtedness." No evidence was offered by any party to the effect that the appellants were issuing "notes" or "evidences of indebtedness," much less that they were issuing such notes or evidences of indebtedness "in a mercantile or consumer transaction." The trial court had no obligation to instruct the jury concerning issues not fairly raised by the evidence presented at trial. *Lester v. State,* 212 Tenn. 338, 346, 370 S.W.2d 405, 409 (1963); *State v. Leaphart,* 673 S.W.2d 870, 873 (Tenn.Crim.App.1983). An instruction on this issue could have only served to confuse the jury, not to enlighten them.

Even assuming that evidence which would justify the proposed instruction was presented at trial, the appellant Brewer has failed to make any references thereto in his brief on appeal. This failure constitutes waiver of the issue. Tenn.Cr.Crim.R. 10(b); *State v. Killebrew,* supra; *see also* Tenn.R.App.Proc. 27(a)(7) and (g). Furthermore, the appellant Brewer cannot raise this issue since he did not submit a written special request for an instruction on this issue to the trial court at the appropriate time. *State v. Dulsworth,* 781 S.W.2d 277, 288 (Tenn.Crim.App.1989).

---

16. The appellant Brewer joined the appellant Frost in this contention. Our analysis applies

equally to the rights of each appellant.

For all of the above reasons, the trial court did not err in refusing to instruct the jury concerning the exclusionary language. This issue has no merit.

## IV

The appellant Frost next contends that the trial court erroneously failed to instruct the jury concerning the requirement of reliance by the victims on the misrepresentations for which the appellants were convicted. The appellant Frost, however, during the trial in the court below, neither objected to the trial court's failure to charge the jury that reliance was an element of the offense nor submitted a special request for a jury instruction on the issue of reliance.

Generally, "[i]n the absence of an objection or a special request, a defendant may not later raise an issue regarding an omission in the court's charge." *State v. Norris,* 874 S.W.2d 590, 600 (Tenn.Crim.App.1993) (citing *State v. Reece,* 637 S.W.2d 858, 861 (Tenn. 1982); *State v. Blackwood,* 713 S.W.2d 677, 681 (Tenn.Crim.App.1986)).[17] Thus, the issue of an omission in the court's charge is usually waived if the defendant fails to raise it at the trial level.[18]

■ However, Frost contends that reliance is an essential element of securities fraud. Whether requested or not, the trial court has the duty of instructing the jury with respect to essential elements of the offenses charged. *See State v. Teel,* 793 S.W.2d 236, 249 (Tenn.), *cert. denied,* 498 U.S. 1007, 111 S.Ct. 571, 112 L.Ed.2d 577 (1990); *Casey v. State,* 491 S.W.2d 90, 94–95 (Tenn.Crim.App.1972). Nevertheless, because reliance is not an element of any of the charged offenses, Frost cannot prevail on this issue.

■ The statutory provisions concerning misrepresentations upon which the appellant Frost was convicted provide as follows:

It is unlawful for any person, in connection with the sale or purchase of any security in this state, directly or indirectly:

(1) To employ any device, scheme, or artifice to defraud; [or]

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, or the circumstances under which they are made, not misleading[.]

Tenn.Code Ann. § 48–2–121(a)(1)–(2). Upon even a cursory reading of that provision, it is evident that proof of reliance is not expressly mandated by the statute. We must assume, therefore, that the appellant Frost is advocating that this Court impose such an element in our interpretation and application of the statutory provision.

In support of his contention that reliance on the misrepresentations by the victims is an element of the offense, the appellant Frost cites two cases, *Diversified Equities, Inc. v. Warren,* 567 S.W.2d 171 (Tenn.Crim. App.1976) and *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981). Those cases, however, are not on point and, therefore, are of no persuasive value in that they both concern *private* rights of action for damages concerning violations of securities laws rather than criminal enforcement of such laws by governmental entities.

Cases from other jurisdictions have uniformly illustrated that the requirements of proof in private actions and criminal cases are not identical. For example, in *Kramas v. Security Gas & Oil, Inc.,* which involved a private action concerning violations of federal securities laws, the United States Court of Appeals for the Ninth Circuit stated: "Prosecutions and enforcement actions involve interests and procedures different from those involved in private damage suits. The Government is not 'required to prove that anyone was defrauded or that any investor sustained loss,' . . . but such proof is essential to

---

17. Additional authority on this issue may be found in *Rule v. Empire Gas Corp.,* 563 S.W.2d 551, 554–55 (Tenn.1978); *State v. Hardin,* 691 S.W.2d 578, 581 (Tenn.Crim.App.1985); *State v. Smith,* 626 S.W.2d 283, 285 (Tenn.Crim.App. 1981).

18. Of course, procedural default that rises to the level of plain error is not waived. Tenn. R.Crim.P. 52(b). A plain error analysis is unnecessary in the present case.

recovery by a private investor." 672 F.2d 766, 770 (9th Cir.1982) (partially quoting *Farrell v. United States,* 321 F.2d 409, 419 (9th Cir.1963) which involved a criminal prosecution for fraudulent acts concerning securities). In accord with *Kramas,* other opinions in cases involving criminal prosecutions for fraudulent acts which violated securities laws have refused to require reliance as an element of the offenses. *E.g., United States v. Amick,* 439 F.2d 351, 366 (7th Cir.1971); *Farrell,* 321 F.2d at 419; *State v. Facer,* 552 P.2d 110, 111–12 (Utah 1976); *State v. Shade,* 104 N.M. 710, 726 P.2d 864, 872 (Ct.App. 1986) *overruled on other grounds by State v. Olguin,* 118 N.M. 91, 879 P.2d 92, 99 (Ct.App. 1994).[19]

Based upon the unambiguous language of the statutory provisions and the foregoing cases, we decline to find reliance by victims is an element to the offense of omitting or misrepresenting a material fact in connection with the sale or purchase of securities. This issue is without merit.

## V

In the next assertion of error, the appellant Brewer contends that the trial court erred by declining to rule that his reliance on the advice of his attorney that his undertaking was not in violation of the law was a defense to all charges. Brewer has failed to cite any authority from this jurisdiction in support of his proposition, instead relying solely upon persuasive authority from numerous other fora. This approach would be meritorious and even commendable if not for the fact that the Supreme Court of Tennessee has already spoken on this issue.[20]

■ In *Hunter v. State,* the Tennessee Supreme Court, in upholding a jury instruction that acting upon the advice of counsel is not a defense to embezzlement, stated:

> The fact that a person honestly believes that he has a right to do what the law declares to be illegal will not affect the criminality of the act. The advice of counsel furnishes no excuse to a person for violating the law, and cannot be relied upon as a defense in a criminal action.

158 Tenn. 63, 69, 12 S.W.2d 361, 362 (1928) (citation omitted). The Court further stated that to hold otherwise "would be productive of disastrous results, opening a way of escape from prosecution for the criminally inclined through a door held ajar by ignorant, biased, or purchasable advisors." *Id.,* 158 Tenn. at 70, 12 S.W.2d at 363. We hold that this case is governed by the rule and analysis in *Hunter* given the broad language employed by the Supreme Court.

Several more recent authorities exhibit a continued adherence to this rule. *State v. Smith,* 656 S.W.2d 882, 888–89 (Tenn.Crim. App.1983) (trial court properly rejected a proposed jury instruction that the defendant was not liable for willful wrongdoing if he acted on the advice of his attorney); *Garrett v. Forest Lawn Memorial Gardens, Inc.,* 588 S.W.2d 309, 315 (Tenn.Ct.App.1979) (the defense of acting under the advice of counsel is not sufficient to prevent a finding of guilt in either a civil or criminal contempt case); *Robinson v. Air Draulics Eng'g Co. Inc.,* 214 Tenn. 30, 36, 377 S.W.2d 908, 911 (1964); 11 *Tenn.Jur.,* § 8 at 293 (Michie 1992). This issue is without merit.

## VI

■ Prior to trial the appellant Brewer filed a motion entitled "Motion to Strike All References to the Tennessee Securities Act,

---

19. This rule is also applied in civil enforcement proceeding initiated by the Securities and Exchange Commission. In such cases, "the Commission is not required to prove that any investor actually relied on the misrepresentations or that the misrepresentations caused any investor to lose money." *SEC v. Blavin,* 760 F.2d 706, 711 (6th Cir.1985); *accord SEC v. North Am. Research & Dev. Corp.,* 424 F.2d 63, 84 (2d Cir. 1970); *Berko v. SEC,* 316 F.2d 137, 143 (2d Cir.1963); *SEC v. Lum's, Inc.,* 365 F.Supp. 1046, 1059 (S.D.N.Y.1973).

20. This Court does not possess the authority or power "to revise, alter, modify, modernize or otherwise change a common law rule created by the Supreme Court." *State v. Braden,* 867 S.W.2d 750, 759 (Tenn.Crim.App.1993); *see Barger v. Brock,* 535 S.W.2d 337, 340–41 (Tenn. 1976); *Bloodworth v. Stuart,* 221 Tenn. 567, 572, 428 S.W.2d 786, 789 (1968); *Watkins v. State,* 216 Tenn. 545, 552, 393 S.W.2d 141, 144 (1965); *State v. Flatt,* 727 S.W.2d 252, 254 (Tenn.Crim. App.1986); *State v. Davis,* 654 S.W.2d 688, 690 (Tenn.Crim.App.1983).

Violations Thereof, or Paraphrases Thereof, Such as 'These Securities' or 'Securities Laws.'" In the last paragraph of the Motion, the appellant Brewer alternatively requested that the trial be bifurcated with the first phase being concerned solely with the question of whether the appellants' enterprise constituted the selling of securities. Both the primary and alternative propositions were ruled upon adversely to his proposals.

On appeal, he contends that the refusal by the trial court to bifurcate the trial was error. In support of his argument, he relies exclusively on the Supreme Court case of *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 (Tenn.1992), a civil case in which the Court held that where punitive damages are sought, the defendant has a right to have a bifurcated trial in which the issues of liability and compensatory damages are resolved before the issue of punitive damages is presented. The facts and circumstances of *Hodges* are clearly inapposite to the present case.

In short, the appellant Brewer has failed to cite any case from this or any other jurisdiction that requires a bifurcated trial under facts similar to the facts in this case. We believe that this failure to city authority is because none exists. Furthermore, we are certainly not inclined to create such a rule of criminal procedure by judicial fiat.

### VII

The appellant Frost contends that the evidence adduced at trial was not sufficient to sustain the jury's verdict that he was guilty of four counts of obtaining money by means of false pretenses.[21] We disagree.

The offense of "false pretense" was defined in Tenn.Code Ann. § 39–3–901 (repealed) and was punishable as in cases of larceny. In *State v. Arnold*, 719 S.W.2d 543 (Tenn.Crim.App.1986), this Court reiterated the elements of this offense as follows:

(1) the making, with intent to defraud of a false representation of a past or existing fact;

(2) the representation was calculated to deceive the person to whom it was made and did in fact deceive that person;

(3) the false pretense was capable of defrauding;

(4) the defendant obtained something of value from the injured person without giving just compensation;

(5) the thing obtained was valued at more than or less than ... $200.00 ... (as for larceny, the value will determine the punishment).

*Id.* at 546 (citing *State v. Smith*, 612 S.W.2d 493, 497 (Tenn.Crim.App.1980)). The false pretense must be a statement of some existing fact and not a mere promise to do something in the future. *Smith*, 612 S.W.2d at 497 (citing *Canter v. State*, 75 Tenn. 349, 351 (1881)). However, when a false promise is coupled with a false statement of fact, the two are taken together as a fraudulent pretense. *Smith*, 612 S.W.2d at 497 (citing *Cook v. State*, 170 Tenn. 245, 94 S.W.2d 386, 388 (1936)). Moreover, reliance by the alleged victim upon the false pretense is not required; it is only necessary that someone relied upon the representation to the effect that the alleged victim is harmed. *Horn v. State*, 553 S.W.2d 736, 737 (Tenn.1977). Finally, the representation is not required to be one calculated to defraud a person of ordinary prudence and caution. *Beck v. State*, 203 Tenn. 671, 676, 315 S.W.2d 254, 256 (1958).

The principles which govern this court's review of a conviction by a jury are well settled. This court must review the record to determine if the evidence adduced at trial was sufficient "to support the finding of the trier of fact of guilt beyond a reasonable doubt." Tenn.R.App.P. 13(e). This rule is applicable to determinations of guilt predicated upon direct evidence, circumstantial evidence, or a combination thereof. *State v.*

---

**21.** The appellant Frost was charged with several counts of obtaining money through false pretenses during the period beginning on or about May 19, 1987 and ending on December 31, 1988. During that period, the statutory prohibition of obtaining money by false pretense was codified at Tenn.Code Ann. § 39–3–901 (1982). That offense is now merged into the offense of theft. Sentencing Commission Comments to Tenn.Code Ann. § 39–14–101.

*Matthews,* 805 S.W.2d 776, 779 (Tenn.Crim. App.1990).

In examining the sufficiency of the evidence, this court does not reevaluate the weight or credibility of the witnesses' testimony as those are matters entrusted exclusively to the jury as the finders of fact. *State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984); *State v. Wright,* 836 S.W.2d 130, 134 (Tenn.Crim.App.1992). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. *Liakas v. State,* 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956).

A jury verdict of guilty, approved by the trial judge, accredits the testimony of the state's witnesses and resolves all conflicts in favor of the theory of the state. *State v. Williams,* 657 S.W.2d 405, 410 (Tenn.1983); *State v. Hatchett,* 560 S.W.2d 627, 630 (Tenn. 1978). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. *State v. Cabbage,* 571 S.W.2d 832, 835 (Tenn.1978). Moreover, a guilty verdict against the appellant removes the presumption of innocence and raises a presumption of guilt on appeal, *State v. Grace,* 493 S.W.2d 474, 476 (Tenn. 1973), which the appellant has the burden of overcoming. *State v. Brown,* 551 S.W.2d 329, 330 (Tenn.1977).

Where the sufficiency of the evidence is at issue, the relevant question on appeal is whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have determined that the essential elements of the crime were established beyond a reasonable doubt. Tenn.R.App.P. 13(e); *Jackson v. Virginia,* 443 U.S. 307, 314–324, 99 S.Ct. 2781, 2786– 2792, 61 L.Ed.2d 560 (1979). In addition, a conviction may be based entirely on circumstantial evidence where the facts are "so clearly interwoven and connected that the finger of guilt is pointed unerringly at the [appellant] and the [appellant] alone." *State v. Crawford,* 225 Tenn. 478, 484, 470 S.W.2d 610, 612 (1971).

In the present case, the appellants induced prospective investors to pay inflated prices for specialty items by representing to them that a substantial portion of the excess money from the sales would be set aside for the establishment and stocking of the wholesale club store. Testimony at trial revealed that one of the primary purposes of the product purchasers was indeed to contribute capital toward the wholesale club store, the opening of which they hoped would provide them with sizeable profits.

Bank records of the corporation, however, exhibited that the money that individuals had paid for their products was deposited into the general bank account of the company. It was then utilized to pay operating expenses and undisclosed commissions, as well as "overrides" and royalties to the appellants, their families, and their individual creditors. In short, none of the proceeds from the sales of specialty products were ever set aside for the opening or stocking of the store.

In addition, as part of a scheme to project an air of success, the appellants told prospective members that Faron Young was a director of the corporation when, in fact, he was not. They told stories of success with similar ventures in other states, but failed to disclose the legal difficulties encountered in the other jurisdictions. Through the use of these tactics, many individuals were ensnared.

Thus, there was ample, indeed overwhelming, evidence from which any rational finder of fact could determine that the appellants were guilty of all of the elements of obtaining personal property under false pretense beyond a reasonable doubt. Tenn.R.App.Proc. 13(e); *Jackson v. Virginia,* supra. The issue is without merit.

## VIII

As previously noted, one of the victims of the investment scheme established by the appellants was Faron Young, a world-famous country music artist. The appellant Frost was charged in Counts 19, 20, and 21 of the indictment in connection with the sale of securities to Mr. Young. At trial, Mr. Young testified that he dealt exclusively with an individual named Bobby Fraizer in his purchase of stock in the corporation, and that he

had no contact with the appellant Frost at any time.

After stating that there was no proof that the appellant Frost participated in or had any knowledge of the sale of stock to Mr. Young, the trial judge granted a judgment of acquittal concerning Counts 19 and 20. However, the trial judge permitted Count 21 to be presented to the jury and the appellant Frost was convicted on that count. He now contends that it was error for the trial court to refuse to grant a judgment of acquittal concerning Count 21 which charged him with omitting to state material facts in the sale of the securities to Mr. Young. The appellant Frost presents his contention in the form of a sufficiency of the evidence challenge.[22]

Review of the record reveals that counsel for the appellant Frost failed to point out to the court the relation between Count 21 and Counts 19 and 20. Under some circumstances this could have constituted waiver. However, given the trial court's finding that no proof was introduced that the appellant Frost participated in or had knowledge of the transaction with Mr. Young, the trial court's failure to grant a judgment of acquittal on Count 21 rose to the level of plain error. *See State v. Ogle*, 666 S.W.2d 58, 60 (Tenn.1984); Tenn.R.Crim.Proc. 52(b); *see also* Tenn. R.App.Proc. 36(a). In short, the facts contained in the record and any inferences which may be reasonably drawn from the facts are insufficient, as a matter of law, for a rational trier of fact to find the appellant Frost guilty beyond a reasonable doubt on Count 21. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). Accordingly, we reverse the trial court and dismiss the conviction under Count 21.[23]

## IX

Count One of the indictment charged the appellant Frost with engaging in a scheme to defraud in connection with the sale of securities. The appellant contends that Count One was comprehensive of all of his participation in the enterprise, both before and after the Commissioner of Insurance ordered the appellants to cease and desist. He asserts that all of the remaining counts of the indictment were simply restatements of particular portions of Count One. Having been convicted on Count One, the appellant Frost argues that all of the remaining counts on which he was found guilty were multiplicitous and, therefore, all counts except Count One should have been dismissed by the trial court.

The anti-fraud provisions of the Tennessee Securities Act provide that:

It is unlawful for any person in connection with the sale or purchase of any security in this state, directly or indirectly:

(1) To employ any device, scheme, or artifice to defraud;

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Tenn.Code Ann. § 48–2–121(a). In Count One, the appellant Frost was charged with violating Tenn.Code Ann. § 48–2–121(a)(1). In Counts 5, 8, 11, 14, 17, and 21, the appellant Frost was charged with violating Tenn. Code Ann. § 48–2–121(a)(2). While there are no Tennessee cases holding that the three subdivisions of Tenn.Code Ann. § 48–2–121(a) constitute separate and distinct offenses, other jurisdictions with similar provisions have so held.

For example, the provisions in § 77(q) of the federal Securities Act of 1933 are nearly identical in all relevant aspects to the anti-fraud provisions of the Tennessee Securities

---

**22.** The rules regarding the appellate examination of the sufficiency of the evidence which supports a guilty verdict were presented in the discussion of the previous issue and for the sake of brevity shall not be repeated.

**23.** Although the conviction on Count 21 is reversed and dismissed, the appellant Frost's effective sentence remains unaffected in that his sentence on Count 21 was to run concurrently with the sentences resulting from his convictions on Counts 17 and 18.

Act.[24] Construing these provisions, the federal courts have held that:

> Because the three subdivisions of § 77(q)(a) express the statutory purpose of making the acts specified in those subdivisions separate and distinct, there is strong logic to the view that each of the different acts defined in those subdivisions can serve as an "allowable unit of prosecution." ... The distinctions between the three subdivisions may seem esoteric because they entail hairline differences of proof. But Congress, who deliberately made the distinctions, evidently did not think them so. And experience with criminal trials demonstrates that the unexpected frequently happens.

*United States v. Birrell,* 266 F.Supp. 539, 543 (S.D.N.Y.1967) (citations omitted). In *United States v. Naftalin,* the United States Supreme Court cited the *Birrell* decision with approval. 441 U.S. 768, 774, 99 S.Ct. 2077, 2082, 60 L.Ed.2d 624 (1979).

■ Where the same actions or transactions constitute a violation of two or more distinct statutory provisions, the standard for determining "whether there are [multiple] offenses or only one is whether each provision requires proof of an additional fact which the other does not." *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932); *State v. Black,* 524 S.W.2d 913, 919 (Tenn.1975). "As *Blockburger* and other [double jeopardy] decisions applying its principle reveal ... the Court's application of the test focuses on the statutory elements of the offense." *State v. Anthony,* 817 S.W.2d 299, 303 (Tenn.1991), quoting *Iannelli v. United States,* 420 U.S. 770, 785, 95 S.Ct. 1284, 1293, 43 L.Ed.2d 616 (1975). Thus, it is clear that the crucial inquiry is not whether the factual allegations proffered in various counts of the indictment overlap, but whether the various counts require proof of the same facts.

■ Here, in Count One the appellant Frost was convicted of employing a scheme to defraud in connection with the sale of securities. The existence of a "scheme to defraud" had to be proven to establish that the offense had been committed. Counts 5, 8, 11, 14, 17 and 21 did not require proof of a scheme to defraud. Instead, those six counts which charged that the appellant Frost omitted to state material facts in connection with the sale of a security required proof of specific omissions and also that the omissions occurred concerning the particular victim named in each count. Conversely, Count One did not require proof of those particular omissions or those victims in order to establish that the appellant Frost employed a scheme to defraud. *See United States v. Stull,* 743 F.2d 439, 442 n. 2 (6th Cir.1984); *United States v. Beecroft,* 608 F.2d 753, 757 (9th Cir.1979); *United States v. Stirling,* 571 F.2d 708, 728–29 (2nd Cir.), *cert. denied,* 439 U.S. 824, 99 S.Ct. 93, 58 L.Ed.2d 116 (1978). Count One encompassed numerous victims and various aspects of the scheme that were not alleged in the material omissions counts.

■ Similarly, in Count Two the appellant Frost was convicted of selling securities without a license. Evidence that the appellant Frost was selling securities without a license, while essential to Count Two, was unnecessary for conviction under Count One. Furthermore, proof of any type of scheme to defraud was not required for a guilty verdict under Count Two, since even one selling securities otherwise legitimately could be convicted of that offense if not properly licensed.

■ In Count Three the appellant Frost was convicted of violating an Order of the Commissioner of Commerce and Insurance.

---

**24.** The anti-fraud provisions of the federal Securities Act of 1933 provide that:

(a) It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly:
(1) to employ any device, scheme or artifice to defraud, or
(2) to obtain money or property by means of an untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
(3) to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser. 15 U.S.C. § 77(q)(a).

Proof that the appellant Frost violated the cease and desist order was necessary for a conviction on Count Three, but it was unnecessary for conviction under any of the other counts of the indictment. Moreover, a showing of a scheme to defraud is not a requisite element for a conviction on Count Three.

■ The appellant Frost was convicted on Counts 6, 9, 12, 15 and 18 for selling unregistered securities. Evidence establishing that the securities which were sold were unregistered was a requisite element of each of those counts. Such proof was not, on the other hand, necessary for conviction under Count One. Likewise, none of those counts required a showing of a scheme to defraud in connection with the sale of securities, whereas such proof was paramount to a conviction under Count One.

■ Lastly, all of the above securities-related counts, including Count One, require proof that the appellant Frost sold a "security" in Tennessee. However, that is not a fact that needed to be proven under the false pretenses counts, 4, 10, 13 and 16. The false pretenses counts require proof that the appellant Frost obtained money through the false representation of a past or existing fact, whereas Count One does not. Further, proof that the false representation was capable of defrauding is necessary for conviction on the false pretenses counts, but is not an element under the Securities Act, which Count One alleged was violated.

In short, each of the various counts on which the appellant Frost was convicted required proof of facts which were unnecessary for conviction under other counts of the indictment. *See Blockburger*, 284 U.S. at 304, 52 S.Ct. at 182; *Black*, 524 S.W.2d at 919. Accordingly, the convictions were not multiplicitous.

We conclude by noting that the appellant Frost's reliance upon the case of *State v.*

O'Guin, 641 S.W.2d 894 (Tenn.Crim.App. 1982) is misplaced. In *O'Guin*, six automobiles were stolen from a single victim in one general scheme and this Court found that the six larceny convictions merged into a single conviction. *Id.* at 898. In the present case, by contrast, various individuals were victimized by the investment scheme implemented by the appellant Frost and others. Moreover, the appellant Frost was indicted for violation of more than one statutory provision.

This issue has no merit.

## X

■ During the case-in-chief of the prosecution, the State introduced evidence concerning prior financial, legal and regulatory difficulties previously experienced by the appellant Frost in other states. This evidence included proof of financial failures which ended in bankruptcies, civil injunctions, and criminal convictions concerning ventures substantially similar to the one involved in the present case.[25] The general rule concerning such evidence is that it is inadmissible even when the previous crimes or acts are of the same character as the charged offense because such evidence is irrelevant and invites the "finder of fact to infer guilt from propensity." *State v. Hallock*, 875 S.W.2d 285, 290 (Tenn.Crim.App.1993); *accord State v. Parton*, 694 S.W.2d 299, 302 (Tenn.1985); *Bunch v. State*, 605 S.W.2d 227, 229 (Tenn.1980); *Lee v. State*, 194 Tenn. 652, 654, 254 S.W.2d 747, 747 (1953); *Mays v. State*, 145 Tenn. 118, 140, 238 S.W. 1096, 1102 (1921). Moreover, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait." Tenn. R.Evid. 404(b).

There are, however, exceptions to this general prohibition,[26] two of which the trial court

---

**25.** Specifically, the jury heard evidence against the appellant Frost concerning an Ohio civil injunction dated March 28, 1972; another injunction in Ohio in 1977; a bankruptcy in Ohio in 1978; a related bankruptcy in Ohio in 1979; a conviction for securities violations in Ohio on or about August 16, 1978; and a civil injunction in Florida filed on or about February 20, 1978.

**26.** In *State v. Parton*, 694 S.W.2d 299, 302 (Tenn. 1985), the Supreme Court reiterated several of the exceptions when it stated: "evidence of crimes other than that on trial has been admitted as being relevant to such issues on trial as motive of the defendant, intent of the defendant, identity of the defendant, the absence of mistake or accident if that is a defense, and, rarely, the existence

relied upon in admitting the evidence. First, the lower court found that the evidence was admissible to prove the appellants' intent and guilty knowledge.[27] The second ground, which the trial court found to be the most significant, was that the evidence went to prove an element of the crime in that the appellants failed to disclose material facts to purchasers of the specialty products. The appellant Frost challenges those findings on several bases.

## A

In the first portion of a bifurcated relevancy challenge, the appellant Frost contends that the civil injunctions and criminal conviction are too remote in time to have been relevant to this case in that all of the injunctions and the criminal conviction occurred at least ten years prior to this case. In support of his theory he cited several cases in his brief in which evidence of prior crimes that occurred between two and eleven years before the charged offense were excluded on grounds of remoteness.[28] Moreover, because such evidence is inherently prejudicial, its admission often requires the reversal of the conviction and a new trial. *State v. Parton,* 694 S.W.2d at 302 (Tenn. 1985); *Bunch v. State,* 605 S.W.2d 227, 229 (Tenn.1980). While we are mindful of these decisions, other cases make it clear that the character and intricacies of fraud cases often require slight modification of general eviden-

tiary rules in order to administer justice. In *Perritt v. Perritt,* the Court stated:

Fraud assumes many shapes, disguises and subterfuges, and is generally so secretly hatched that it can only be detected by a consideration of facts and circumstances, which are frequently trivial, remote and disconnected, and which cannot be interpreted without bringing them together, and contemplating them all in one view. In order to do this it is necessary to pick one fact or circumstance here, another there, and a third yonder, until the collection is complete ... A wide latitude of evidence is allowed; and if a fact or circumstance relates directly, or indirectly, to the transaction, it is admissible, however weak or slight it may be, its relevance depending not upon its weight or force, but upon its bearing or tendency.

528 S.W.2d 561, 566 (Tenn.App.1973) quoting Gibson's Suits in Chancery, § 456 (5th ed. 1955)). In *State v. Kenner,* 640 S.W.2d 51, 55 (Tenn.Crim.App.1982), this Court recognizes the unique nature of fraud cases when it held that "[m]ore remote evidence is admissible as relevant in fraud cases than is generally admissible in other cases." Given the facts and circumstances of the present case, and the nature of the charges against the appellant Frost, we hold that the evidence of prior injunctions and the conviction was not so remote as to be irrelevant.[29]

of a larger continuing plan, scheme, or conspiracy of which the crime on trial is a part." (citations omitted).

27. *See State v. Hallock,* 875 S.W.2d 285, 291 (Tenn.Crim.App.1993), where this Court held: "[w]hen the nature of the crime is such that guilty knowledge must be proved, evidence is admissible that at another time and place not too remote the accused committed or attempted to commit a crime similar to that charged. Also evidence of other crimes committed by the accused similar to that charged is relevant and admissible when it shows or tend to show a particular criminal intent, which is necessary to constitute the crime charged."

28. Specifically, the appellant Frost's brief discusses *State v. Davis,* 706 S.W.2d 96 (Tenn.Crim. App.1985) (evidence of rape which occurred four years prior to trial excluded), *State v. Bobo,* 724 S.W.2d 760 (Tenn.Crim.App.1981) (evidence of a robbery which occurred two years prior to charged offense excluded), *State v. Hooten,* 735

S.W.2d 823 (Tenn.Crim.App.1987) (evidence of rapes occurring five to eight years prior to charged offenses were inadmissible even though they were similar in character), and *State v. Burchfield,* 664 S.W.2d 284 (Tenn.1984) (evidence of crime that occurred 11 years prior to the incident under consideration at trial was inadmissible due, in part, to its remoteness in time).

29. The argument concerning remoteness contained in the appellant Frost's brief also mentions that the remoteness in time of the prior wrongs destroys the "materiality" of such acts and events insofar as the State alleges that the appellants were required to disclose them to potential and actual participants. We summarily reject this contention, finding that a reasonable trier of fact could deem information concerning the prior conviction and civil injunctions "material" in a case of this nature.

24 ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇ The appellant Frost further challenges the relevancy of the prior civil injunctions and the criminal conviction, at least insofar as the evidence was admitted to show intent and guilty knowledge, on a second theory. He relies on the ground that where the government has a strong case on the issue of intent, extrinsic evidence of prior crimes should be excluded, citing *United States v. Beechum,* 582 F.2d 898 (5th Cir. 1978) and several cases from this state which are not as factually similar to the present case. We respectfully disagree.

The evidence of the prior injunctions and criminal convictions was significant and reasonably necessary to proving beyond a reasonable doubt that the appellants violated the securities laws with the requisite intent. Specifically, the evidence was relevant to show that the appellants had guilty knowledge that the interests they were selling were securities; that the appellants knew they were required to register with the Securities Division; and that the appellants knew they were required to fully disclose and intentionally failed to disclose to potential participants their prior civil injunctions and criminal convictions when representing their prior successes. In such circumstances, it is well settled that "evidence of other crimes or acts of misconduct may be introduced for ... limited purposes, such as to show guilty knowledge or intent." *State v. Frazier,* 683 S.W.2d 346, 350 (Tenn.Crim.App.1984) (citation omitted); *see State v. Little,* 854 S.W.2d 643, 649 (Tenn.Crim.App.1992). Moreover, the appellant Frost has failed to make any references to the record to support his contention that the prosecution had a strong case concerning the issues of intent and guilty knowledge separate and distinct from the evidence in question.

Other jurisdictions have held that evidence of similar crimes and other wrongs may be admitted to establish intent in cases involving the sale of securities. *E.g., Hardcastle v. State,* 25 Ark.App. 157, 755 S.W.2d 228 (1988) (evidence of an injunction issued against the defendant in a similar unrelated securities

case was properly admitted to prove an intent to defraud and lack of mistake in a securities fraud prosecution); *Shappley v. State,* 520 S.W.2d 766, 771 (Tex.Crim.App. 1974) (evidence of other sales of securities by the accused was properly admitted to prove intent and guilty knowledge in a prosecution for securities fraud and selling securities while not registered).[30] For all of the foregoing reasons, this issue has no merit.

**B**

▇▇ The appellant Frost alternatively contends that even if the prior civil injunctions and the criminal conviction are relevant, the probative value of the evidence was outweighed by the unfair prejudice to him in having the evidence before the jury. In his brief, he states that the prejudice in this case is "self-evident." Relying on *Harrison v. State,* 2 Tenn.Crim.App. 564, 455 S.W.2d 617, 619 (1970), he further argues that the trial court's limiting instruction to the jury concerning the purposes for which the jury could use the evidence was an "unmitigated fiction" given the strength of the evidence of prior wrongs.

Pursuant to Tenn.R.Evid. 404(b)(3), a court must exclude "evidence if its probative value is outweighed by the danger of unfair prejudice." *Accord State v. Parton,* 694 S.W.2d at 302 (Tenn.1985). The determination of "the probative of the evidence is within the discretion of the trial judge, whose determination will not be overturned absent an abuse of that discretion." *State v. Hudson,* No. 03C01–9201–CR–9, slip op. at 4, 1992 WL 163412 (Tenn.Crim.App.1992) (citing *State v. Leath,* 744 S.W.2d 591, 593 (Tenn.Crim.App.1987)). As stated earlier, the trial court admitted the evidence on two grounds: (1) because it tended to show the intent and guilty knowledge of the appellants and (2) because it was necessary to establish an element of several offenses which concerned the omission of material facts to potential and actual participants. Concerning intent and guilty knowledge, this was the primary evidence that the State relied upon

---

**30.** *Shappley* has been superseded by statute on other grounds unrelated to the proposition for

which the case is cited herein.

at trial to prove that the appellants knew that they were selling securities in violation of securities laws prior to the issuance of the cease and desist order. The appellant Frost contends that his criminal intent was sufficiently established by other evidence at trial and, therefore, the evidence of prior wrongs is of scant probative value. However, as previously noted, he fails to make any references to such other evidence in his brief.

In regard to the second ground on which the trial court admitted the evidence, it is clear that if the lower court had not admitted the evidence, the counts alleging that the appellants failed to disclose material facts to potential and actual investors would have had to be dismissed. This is due to the fact that the prior conviction and civil injunctions were the primary facts that the State claimed the appellants had a duty to reveal in order to avert misrepresenting their prior successes in similar ventures.

In short, although the admission of the evidence could have caused some quantum of prejudice to the appellant Frost, *See; Bunch v. State,* 605 S.W.2d 227, 229 (Tenn.1980), the evidence was paramount to proving an essential element of the crimes charged in several counts of the indictment and was of major significance on the issue of intent. Moreover, the trial court followed the procedures mandated by Tenn.R.Evid. 404(b) in admitting the evidence and gave an appropriate limiting instruction to the jury concerning the context in which the evidence could be considered. Under such circumstances, this Court does not find that the trial judge abused his discretion in admitting the evidence.

### C

■ In a second alternative argument, the appellant Frost insists that even if the evidence was admissible, the procedural method by which it was presented to the jury was improper. Specifically, he contends that the trial should have bifurcated the trial so that evidence of prior wrongs would come in only in the second phase, after the jury had made a determination in the first phase that the enterprise involved the sale of securities. In support of his contention, he cites *Harri-son v. State,* 217 Tenn. 31, 394 S.W.2d 713 (1965) and *State v. Warr,* 604 S.W.2d 66 (Tenn.Crim.App.1980). Both of those cases are inapposite to the present case and, therefore, do not mandate a bifurcated trial in this prosecution.

*Harrison* deals with habitual criminal statutes and involves the enhancement of punishment for the triggering offense in light of prior crimes. 394 S.W.2d at 714–18. In such cases, the prior crimes are used solely to establish that the defendant is an habitual criminal and in no way concerns the triggering offense with which he is charged. Although *Warr* was not a habitual criminal case, the practical effect of the statute at issue was the same as the habitual criminal statute. There the charge for carrying a firearm was increased from a misdemeanor to a felony in a second phase of the trial because of the defendant's status as a convicted felon. 604 S.W.2d at 67–68. By contrast, the evidence of prior wrongs offered in the present case was vital concerning numerous counts to show guilty knowledge, intent, and the failure of the appellants to disclose material facts to prospective and actual participants. Those issues were so intertwined with and essential to the determination of the guilt or innocence of the appellants that it would be impossible to partition the proof thereon from the remaining evidence.

Moreover, nothing in Tenn.R.Evid. 404(b) requires courts to bifurcate trials when evidence of prior wrongs is admitted. Instead, the Supreme Court and the legislature, relying heavily upon the Tennessee Supreme Court's holding in *State v. Parton,* 694 S.W.2d at 302, enacted other safeguards in Rule 404(b), Tenn.R.Evid., to protect the rights of criminal defendants and the trial court diligently complied with all of the requirements of Rule 404(b). In discharging those tasks, the judge reserved judgment on the admissibility of the evidence until the last possible moment in the state's case-in-chief in order to be certain that the probative value of the evidence was not outweighed by the danger of unfair prejudice to the appellants. The trial judge also instructed the jury concerning the limited purposes for which the evidence could be used, both at the

time the evidence was admitted and again in the final charge to the jury. After a full and complete examination of those facts and circumstances, we find no error in the trial court's refusal to bifurcate the trial.

These issues are without merit.

## XI

Next the appellant Frost argues that he was denied due process by the failure of the trial court to require the State to disclose certain exculpatory statements to him.[31] In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963), the United States Supreme Court held that the prosecution has a compelling duty to furnish the accused any evidence which is favorable to the accused and material to his guilt or punishment, irrespective of the good or bad faith of the prosecution. *See Workman v. State*, 868 S.W.2d 705, 709 (Tenn.Crim.App. 1993). In *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375, 3380, 87 L.Ed.2d 481 (1985), the Supreme Court held that both exculpatory and impeachment evidence fall under the *Brady* rule.

■ Before an accused is entitled to relief under this theory, he must establish several prerequisites: (a) the prosecution must have suppressed the evidence; (b) the evidence suppressed must have been favorable to the accused; and (c) the evidence must have been material. *See United States v. Bagley, Id.*, 473 U.S. at 674–75, 105 S.Ct. at 3379–80; *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Brady v. Maryland*, 373 U.S. at 87, 83 S.Ct. at 1196–97; *Workman v. State*, 868

S.W.2d at 709; *State v. Marshall*, 845 S.W.2d 228, 232 (Tenn.Crim.App.1992); *Strouth v. State*, 755 S.W.2d 819, 828 (Tenn.Crim.App. 1986). In *State v. Spurlock*, this Court recognized a fourth prerequisite to relief: "the accused must make a proper request for the production of the evidence, unless the evidence, when viewed by the prosecution, is obviously exculpatory in nature and will be helpful to the accused." 874 S.W.2d 602, 609 (Tenn.Crim.App.1993) (citations omitted).

■ Examination of the suppressed evidence revealed information concerning three individuals or situations. First, there was an affidavit from an attorney explaining his withdrawal from representation due to the surfacing of conflicting interests between two defendants he was representing in the case. Next, there was a tape recording of a conversation that took place in the trial judge's chambers in which a defendant in the case explained to the judge why he intended to conduct a pro se defense for the remainder of the trial. Neither of those items of information were favorable, or even relevant, to the guilt or innocence of the appellant Frost. The final undisclosed material consisted of a petition for divorce filed against a witness for the prosecution, the final decree of divorce, and a civil action for damages concerning injuries sustained by the witness' child at school. The only portion of those documents that could possibly have been subject to the *Brady* rule was found in the petition for divorce where it was alleged that the witness for the prosecution had previously had her

---

31. In his brief, the appellant Frost states that he is unable to fully argue the favorableness or materiality of the undisclosed evidence because he was unable to view it. He contends that this was due to the trial court's failure to identify or place into the record the suppressed material after the trial court had agreed to do so. As the State correctly points out, however, the undisclosed material was placed in the record in a large envelope marked "Exhibits Under Seal." Because of the appellant Frost's mistaken belief concerning the record, he failed to make any references to the record or citation to legal authority concerning the specific items of undisclosed information. At least in a technical sense, this constitutes waiver of the issue on appeal.

*State v. Killebrew; supra; State v. Smith,* 735 S.W.2d 831, 836 (Tenn.Crim.App.1987).

Furthermore, pursuant to Tenn.R.App.P. 27(a)(7), a brief submitted to this court is required to contain "citations to the authorities and appropriate references to the record … relied on." Moreover, Rule 10(b) of this court's rules requires that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn.Ct.Crim. App.R. 10(b). However, because of the circumstances under which this technical waiver occurred, we choose to address the merits of the issue.

husband and his family members arrested on false charges.[32]

While this Court can envision how such information, if substantiated, could have been valuable impeachment evidence, the appellant Frost's due process rights were not violated under a *Brady* theory unless he can establish the prerequisites heretofore set forth. We believe that such is not possible. First, concerning whether the prosecution suppressed the evidence, it is significant that the allegations were levied in a document filed in a court. Such documents are a matter of public record and may be obtained by anyone. Where impeachment evidence is equally available to the accused and the prosecution, the responsibility for the failure of the accused to discover it must be borne by the accused. *Workman,* 868 S.W.2d at 709. In addition, although the evidence would arguably be favorable for the appellant Frost, it is not "material" for purposes of the *Brady* rule. In *United States v. Bagley,* the Court stated:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

473 U.S. at 681–82, 105 S.Ct. at 3383; *accord Workman v. State,* 868 S.W.2d at 710. Given the quantum of evidence presented by the prosecution at trial through numerous witnesses and exhibits, and the corroborative nature of the prosecution's evidence, it is implausible that the disclosure of the evidence to the appellant Frost would have had any effect whatsoever on the outcome of the trial. This issue is without merit.

## XII

▇ The appellant Frost next asserts that the trial court erroneously refused to grant him a mistrial when one of the witnesses for the State testified about a recent bankruptcy petition filed by him. The testimony in question was as follows:

WITNESS: Well, after the meeting that day with my boss and I, something just bothered me, and it just didn't sit right. I don't know but it was just something that bothered me. And for some crazy reason I went to the Customs House.

PROSECUTOR: What is the Customs House?

WITNESS: Over—I don't know if anything else is in that building, but I did know that bankruptcies were in that building. And I went over and had them pull C. Donald Frost—

At this point counsel for the appellant Frost interrupted and a bench conference outside of the presence of the jury ensued. This reference to a bankruptcy in connection with the appellant Frost was made in violation of a prior ruling by the trial court which prohibited such references.

During the jury-out conference, counsel for the appellant Frost argued that the testimony was so highly prejudicial to him that a mistrial should be granted. The trial court ruled adversely on the motion but offered to instruct the jury to disregard the remark and to use it for no purpose whatsoever in the trial. The appellant Frost consented to the offer and the limiting instruction was given to the jury. The jury is presumed to have followed the judge's instruction. *State v. Johnson,* 762 S.W.2d 110, 116 (Tenn.1988).

On appeal, the State argues not only that the limiting instruction was adequate protection of the rights of the appellant Frost, but that evidence was actually admissible to show that the appellants had failed to state material facts to purchasers of the investment contracts. This Court need not reach that issue, however, because it is clear that in light of the plethora of other evidence of prior crimes and bad acts that the jury was properly allowed to consider, including other bankruptcies filed by the appellants, that this incident did not justify the granting of a mistrial.

---

**32.** This Court is aware that the statements contained in the petition for divorce are merely allegations and not proven facts. However, the obligation of the prosecutor to disclose is not limited in scope to competent or admissible evidence, but extends to all information that is both favorable and material. *Workman v. State,* 868 S.W.2d at 709; *State v. Marshall,* 845 S.W.2d at 233; *Branch v. State,* 4 Tenn.Crim.App. 164, 173, 469 S.W.2d 533, 536 (1969).

## XIII

The appellant Frost contends that the trial court erroneously permitted one of the victims to testify concerning threats made to her by an individual named Bob Stanley, who was an officer of the corporation and a co-conspirator of the appellants. The appellant Frost asserts that the admission of such testimony was in violation of Tenn.R.Evid. 404 in that it was not relevant to the prosecution of him and its prejudicial effect clearly outweighed the probative value of the evidence.

The appellant apparently is of the belief that the victim testified as to Mr. Stanley's threats of physical violence in the presence of jury. Review of the record, however, reveals that the victim did not testify before the jury as to any threats levied against her by Mr. Stanley. Instead, the entire discussion concerning threats of violence made by Mr. Stanley took place in a jury-out offer of proof. It is true that the victim testified before the jury as to a meeting that she had with Mr. Stanley in which less than amicable words were uttered by Mr. Stanley. However, none of his words or actions at that meeting constituted any sort of threat.

The only threat against the victim that was presented in the presence of the jury was the appellant Brewer's threat to name the victim in a civil lawsuit. Even though this threat was made in the presence of Mr. Stanley, the appellant Frost has not proffered any argument that this action was attributable to Mr. Stanley. Moreover, the appellants made no objection to this testimony at trial.

Since no threats made by Mr. Stanley were discussed in the presence of the jury and the appellants have made no effort to attribute the threats of civil litigation made by the appellant Brewer to Mr. Stanley, it is patently obvious that the victim's testimony did not cause the appellant Frost to suffer any prejudice whatsoever. This issue is without merit.

## XIV

In the final issue of this appeal, the appellant Frost argues that the combination of errors committed in the trial of this case denied him a fair trial. We disagree.

It is well recognized that while individual errors may not require relief, the combination of multiple errors may necessitate the reversal of a conviction. *See State v. Zimmerman,* 823 S.W.2d 220, 228 (Tenn.Crim. App.1991). In attempting to avail himself of this principle, however, the appellant Frost simply reiterated his argument concerning the admission of evidence of prior convictions and civil wrongdoings. We have already discussed the issues related thereto and found them all to be lacking in merit. We decline to engage in tautology here. Moreover, in view of all of the evidence, any and all errors that the trial court may have committed, with the exception of the error discussed in section VIII which has already been addressed, did not affect the verdict of guilty. Tenn. R.Crim.P. 52(b); Tenn.R.App.P. 36(b).

The judgment is affirmed as modified herein.

SUMMERS and TIPTON, JJ., concur.