IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 21, 2005

## STATE OF TENNESSEE v. JAMES R. SMITH

**Direct Appeal from the Criminal Court for Putnam County**
**No. 03-0826     Leon Burns, Judge**

_____

### No. M2005-00615-CCA-R3-CD - Filed January 31, 2006

_____

On appeal, the defendant challenges the trial court's failure to merge his sexual battery and attempted false imprisonment convictions into his rape conviction; the denial of alternative sentencing; and the sufficiency of the evidence.  Upon review, we conclude that the acts perpetrated on the victim constituted three discrete offenses and that the trial court did not err in failing to merge them.  We further conclude that the trial court appropriately denied alternative sentencing and that the evidence was sufficient to support the verdicts.  For these reasons, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID H. WELLES and J.C. MCLIN, JJ., joined.

David N. Brady, District Public Defender, and H. Marshall Judd, Assistant Public Defender, for the appellant, James R. Smith.

Paul G. Summers, Attorney General and Reporter; Preston Shipp, Assistant Attorney General; William E. Gibson, District Attorney General; and Anthony J. Craighead, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

Facts and Procedural History

        The defendant, James R. Smith, was indicted by a Putnam County Grand Jury on two counts of aggravated rape and one count of attempted aggravated kidnaping.  Following a jury trial, the defendant was convicted of the lesser-included offenses of rape (a Class B felony), sexual battery (a Class E felony), and attempted false imprisonment (a Class B misdemeanor).  He was sentenced as a standard violent offender to concurrent sentences of eight years, one year, and six months for the offenses, respectively.  On direct appeal to this court, the defendant presents the following issues for our review:

(1) Whether the trial court erred in failing to merge the sexual battery and attempted false imprisonment convictions into the rape conviction;

(2) Whether the trial court erred in denying alternative sentencing; and

(3) Whether the evidence was sufficient to support the verdicts.

Following thorough review, we affirm the judgments of the trial court.

At trial the victim, Joanna Anthony, testified that on September 14, 2003, she walked her dog from her house down Broad Water Branch Road in rural Putnam County, as was her custom. On the return trip, a man she identified as the defendant pulled up next to her in a red Jeep and inquired about the ownership of a nearby house. When the victim responded that she did not know, the vehicle pulled away, but drove past twice more. Upon again stopping next to the victim, the defendant asked if the vehicle in the driveway of her home was for sale. The victim responded that he would have to ask the owner of the vehicle. The defendant reached down to get a piece of paper, wrote a number on it, and handed it to the victim. As she reached for the paper, he quickly exited the vehicle and apprehended her.

The victim stated that the defendant held a green and black utility knife to her throat and ordered her to perform oral sex on him. She complied, noting at trial that this went on "[a] few minutes," until he pulled her head back and attempted to kiss her. When she resisted, he again ordered her to perform oral sex on him, with this episode lasting five to ten minutes. The defendant then pulled the victim to her feet, removed her shirt, and began touching her breasts while pushing her toward his vehicle. The victim testified that the defendant threw the utility knife into the seat of the vehicle and attempted to push her into the vehicle. When she resisted, the defendant pinned her against the back door, removed her pants, and performed oral sex on her for approximately five to ten minutes. She testified that the assailant again tried to kiss her and stated, "We can do what you want now." The victim responded by saying, "Why aren't you letting me then?" The defendant then apologized and said, "[I] didn't hurt you, at least not physically. I didn't beat you or anything." The victim was able to escape and ran home.

Upon returning home, the victim went into her mother's bedroom and sat in a chair until her mother awakened. She testified that she was unable to tell her mother what happened until approximately 3:00 p.m. because she was stressed and frightened. She later told her older brother Peter what happened, and took a shower and washed her clothes because she "felt dirty." The victim stated that the defendant passed by her house "[a]t least three times" in his vehicle and that a family friend was eventually able to obtain the license plate number.

Approximately three hours after the incident, the victim's mother telephoned Genesis House[1] and the Putnam County Sheriff's Department to report the incident. The victim related the incident to the responding deputy and turned over the license plate number and the receipt that the defendant handed the victim. The victim testified that she did not know the defendant and had never seen him before the incident.

---

[1]It appears from the record that Genesis House is an organization that aids abused women.

On cross-examination, the victim testified that she grew up in Illinois but had moved from place to place since then. She stated that she was home schooled by her mother and grandmother and that she has a learner's permit, but not a driver's license. The victim noted that her only job is with her present employer, Good Shepard Health Foods. She recalled that she had not had any alcohol or drugs on the day of the incident and reiterated that she had never seen the defendant before. The victim stated that she believed the defendant got the utility knife out of his pocket and that he threw the knife in the vehicle as she was performing oral sex on him. She acknowledged that she did not seek medical treatment after the encounter and decided not to be examined because of the amount of time that had passed following the incident. The victim acknowledged that she told Officer Donnie Duncan that she did not have any bruises. Although she attempted to run "several times," she stated that she did not scratch the defendant because she was "so scared and stunned."

Ms. Ronney Anthony, the victim's mother, testified that on the day of the incident, she was asleep when the victim came into her bedroom. When Ms. Anthony awakened, she saw the victim sitting in a chair "shaking like a leaf, and very, very quiet." Although she repeatedly questioned the victim, she stated that it took "the best part of an hour to get any idea of what the matter was." Ms. Anthony testified that she decided to call Genesis House and the Sheriff's Department at approximately 3:00 p.m. because the defendant's vehicle had driven past their house four times. On cross-examination, Ms. Anthony testified that she and the victim's grandmother home schooled the victim and that the victim enjoyed living in the country. She further stated that she called Genesis House first because her foremost concern was for the victim's emotional state and safety.

Peter Anthony, the victim's older brother, testified that the victim was in the kitchen when he arrived home from church on the day of the incident. He recalled that the victim appeared to be "in shock," her lips were blue, and she was not talking. Although she initially did not speak of what happened, over time she began to explain the incident "[i]n very simple language." He stated that the defendant's vehicle passed by three times and that a family friend was able to obtain the license plate number. Finally, Mr. Anthony stated that the police responded approximately three hours after he arrived.

On cross-examination, Mr. Anthony stated that the victim enjoyed living in the country and that the country was better for the victim because she was in poor health. He further stated that he was not sure if the victim was under the care of a doctor at the time of the incident but that she was currently being treated by a natural healing doctor in the Carolinas.

Deputy Tony Branch testified that he was employed by the Putnam County Sheriff's Department and that he responded to the subject incident between 5:30 and 6:00 p.m. He stated that when he arrived, the victim and her mother were on the side porch of the house, and the victim was initially not responsive. Deputy Branch stated that when the victim began talking, she gave him the license plate number of the defendant's vehicle; that it was radioed in; and that officers were sent to the defendant's residence. He further noted that the victim gave a written statement of what had occurred. Finally, he stated that he did not recall if the victim gave him the receipt the defendant had

given her. On cross-examination, Deputy Branch testified that, although he had patrolled the victim's house on his regular route, he did not know the victim personally.

Deputy Ed Henley testified that he was employed by the Putnam County Sheriff's Department and that he responded to the defendant's house. When he arrived, Deputy Henley asked the defendant to come outside to talk, to which the defendant responded that this "must be about that little girl down on the creek." When Deputy Henley inquired as to what happened, the defendant stated that he saw her and asked her to get in the vehicle, which she did. The defendant then told Deputy Henley that he drove down a side road and that the victim performed oral sex on him at his request. Deputy Henley advised the defendant of his <u>Miranda</u> rights and asked him to again recall the incident with the victim, which he did. On cross-examination, Deputy Henley testified that he knew the defendant because of his previous service as a sheriff's department reserve.

Detective Donnie Duncan testified that he was called to investigate the subject incident. He stated that he did not take a rape kit because the alleged act involved oral sex with no ejaculation. Detective Duncan stated that, although the victim turned over the receipt that the defendant gave her, it had "been misplaced." Detective Duncan recalled that the defendant stated that he and victim had a previous sexual relationship.

On cross-examination, Detective Duncan testified that he knew the defendant because he served as chief while the defendant was a sheriff's department reserve. He stated that he had no problems with the defendant at that time. He further stated that the victim did not call his attention to any bruises and that he did not see any scratches or bruising on the defendant. He stated that he did not recall whether he instructed the victim to see a doctor.

Charles Hardy testified that he works at the Tennessee Bureau of Investigation (TBI) crime lab as a serology and DNA analyst. He further stated that there was no DNA or physical evidence in this case. Hardy noted that he did not swab the inside of the victim's mouth to check for the defendant's DNA because, "the odds of finding that suspect's DNA are so great . . . that you're not going to get it, that it's not something that we would test for." Hardy testified that even if a DNA match was obtained, it would not indicate whether or not the contact was forced.

The defendant testified that he had worked as a mechanic with the Cookeville Housing Authority and as a cook at the Waffle House Restaurant. He noted that he had previously participated as a volunteer firefighter and as a sheriff's department reserve. The defendant stated that he lived on his father's property in a shed that he converted into a one-bedroom apartment. He testified that he had seen and been sexually involved with the victim three months prior. The defendant stated that, at that time, he saw the victim walking down the road and asked her if she needed a ride. Although she refused, the defendant stated that they began talking, that they became physically intimate, and that the victim performed consensual oral sex on him in his vehicle.

He stated that on this occasion, he saw the victim and she appeared to recognize him from their earlier encounter. The defendant recalled that he asked the victim about a nearby residence and

that they began talking and eventually kissing. He testified that the encounter again progressed to her performing oral sex on him. Although the defendant stated that he did not have a utility knife in his vehicle, he admitted that officers did find a steak knife upon a consensual search of the vehicle, which he had used to trim wires on his headlight switch. Finally, the defendant stated that his only prior arrest was for public intoxication in the mid-1980's.

On cross-examination, the defendant testified that after their first encounter, he drove down the victim's road one or two times "hoping [he] might get lucky again." Although he knew where the victim lived, he stated that he never approached her house. The defendant indicated that he did not ask about the car in the victim's driveway and did not perform oral sex on her. He estimated that their encounter lasted between fifteen and twenty minutes and further stated that he wrote his phone number on the receipt because she inquired as to how to contact him. The defendant testified that he did not try to intimidate the victim and did not force her to perform oral sex on him. He further stated that he "took off" when he realized that someone was attempting to get his license plate number because the victim stated that she was "afraid [that someone was] going to find out about this."

Billy Joe Smith, the defendant's brother, testified that the defendant came home between 12:00 and 1:00 in the afternoon and that he remained at home until 3:00 or 3:30 p.m. On cross-examination, he testified that he lives in the house with his father, while the defendant lives in the converted shed, where he has resided for three years. Amy Smith Holloway testified that the defendant is her father and that she spoke with him by phone at his home between 1:30 and 2:30 p.m. On cross-examination, she testified that she talked to the defendant for ten to fifteen minutes and admitted that she did not know what happened after their conversation.

Sara Bright testified that she was married to the defendant for five years and that he has a good reputation for honesty and truthfulness. On cross-examination, she stated that she and the defendant divorced in 1986 and that he has since remarried. Amanda Wright testified that she has known the defendant for approximately four years as a co-worker at the Waffle House and that he has a good reputation for honesty and truthfulness. On cross-examination, she acknowledged that she has socialized with the defendant outside of work only one or two times. Geneleta Ashburn testified that she was previously employed at the Waffle House for sixteen years and has known the defendant "as a very good friend." She likewise stated that he has a good reputation for honesty and truthfulness. On cross-examination, she acknowledged that she has not worked with the defendant in two years, but stated that she has made an effort to keep in touch with him by phone.

David Carlile testified that he has known the defendant for between fifteen and eighteen years and that he has a good reputation for honesty and truthfulness. On cross-examination, he admitted that he has not seen the defendant in two years. Additionally, the State stipulated that the testimony of Freddie Judd, owner of L & J Market, and Richard McBroom, fire chief and city manager of Baxter, would be consistent with the previously presented character witnesses. Following the

presentation of evidence, the defendant was convicted of rape, sexual battery, and attempted false imprisonment.[2]

## Analysis

### I. Sufficiency

The defendant challenges the sufficiency of the evidence to support the verdicts. When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Brewer, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not re-weigh or reevaluate the evidence. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence. Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956). To the contrary, this court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. Id. In State v. Grace, the Tennessee Supreme Court stated that "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." 493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.

The defendant in this case was convicted of rape, sexual battery, and attempted false imprisonment. Taken in that order, rape is defined as the:
[u]nlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances:
      (1)     Force or coercion is used to accomplish the act;

---

[2] The record reflects that Count One was based upon the act of forced fellatio; Count Two on forced cunnilingus; and Count Three on the defendant's attempt to force the victim into the vehicle.

-6-

> (2)     The sexual penetration is accomplished without the consent
> of the victim and the defendant knows or has reason to know
> at the time of the penetration that the victim did not consent;
>
> (3)     The defendant knows or has reason to know that the victim is
> mentally defective, mentally incapacitated or physically
> helpless; or
>
> (4)     The sexual penetration is accomplished by fraud.

T.C.A. § 39-13-503(a). "Sexual penetration" includes cunnilingus and fellatio, and emission of semen is not required. T.C.A. § 39-13-501(7).

> Sexual battery is defined as:
> [u]nlawful sexual contact with a victim by the defendant or the defendant by a victim
> accompanied by any of the following circumstances:
>
> (1)     Force or coercion is used to accomplish the act;
>
> (2)     The sexual contact is accomplished without the consent of the
> victim and the defendant knows or has reason to know at the
> time of the contact that the victim did not consent;
>
> (3)     The defendant knows or has reason to know that the victim is
> mentally defective, mentally incapacitated or physically
> helpless; or
>
> (4)     The sexual contact is accomplished by fraud.

T.C.A. § 39-13-505(a). "Sexual contact includes the intentional touching of the victim's [or] the defendant's intimate parts . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). Finally, one commits attempted false imprisonment when he or she takes a "substantial step" toward intentionally removing or confining of another unlawfully, so as to substantially interfere with the victim's liberty. T.C.A. §§ 39-12-101(a)(3); 39-13-302(a).

Taken in a light most favorable to the State, as we must, the evidence established that the defendant, an individual previously unknown to the victim, stopped next to her and inquired about the ownership of a house and a vehicle. On a second occasion, the defendant apprehended the victim, holding a utility knife to her throat. The defendant forced the victim to perform oral sex on him two times, the first episode lasting "a few minutes," and the second, five to ten minutes. He then attempted, unsuccessfully, to push the victim into his vehicle; when she resisted, the defendant pinned her against the back door, removed her clothes, and performed oral sex on her for five to ten minutes. The defendant apologized, and the victim ran home.

Ms. Ronney Anthony, the victim's mother, stated that the victim was "shaking like a leaf, and very, very quiet" when she arrived home. She further indicated that it took "the best part of an hour" to determine what had happened to the victim. Peter Anthony, the victim's brother, testified that the victim appeared to be "in shock" when he arrived home. He further stated that although she did not initially speak of what happened, she eventually related the incident "[i]n very simple language." Deputy Tony Branch likewise stated that the victim was initially unresponsive to

questioning. Based upon the foregoing, we conclude that the evidence presented was sufficient for a jury to convict the defendant of rape, sexual battery, and attempted false imprisonment.

## II. Merger

The defendant also contends that the trial court should have merged his sexual battery and attempted false imprisonment convictions into his rape conviction because all three arose from a single episode, which lasted only a few minutes. The double jeopardy clauses of both the United States and Tennessee Constitutions state that no person will be twice put in jeopardy of life or limb for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. Moreover, it encompasses the following basic protections: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." State v. Phillips, 924 S.W.2d 662, 664 (Tenn. 1996) (citations omitted). The issue before us concerns the last of the three categories.

Multiplicity is the division of conduct into discrete offenses, creating several offenses out of a single offense. Id. In Phillips, our supreme court noted the following factors which are helpful in determining whether offenses are multiplicitous:
> (1) A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;
> (2) If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and
> (3) Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

Id. at 665.

We first analyze whether the charge of attempted false imprisonment was merely incidental to the charge of rape and, therefore, should have been merged with it. In State v. Dixon, our supreme court referenced a two-part test necessary to analyzing the issue at hand. First, we are to determine whether the movement or confinement was beyond that necessary to consummate the act of rape. If so, we are to then analyze whether the movement or confinement: (1) prevented the victim from summoning help; (2) lessened the defendant's risk of detection; or (3) created a significant danger or increased the victim's risk of harm. 957 S.W.2d 532, 535 (Tenn. 1997) (citing State v. Anthony, 817 S.W.2d 299, 306 (Tenn. 1991)). We initially note that the attempted false imprisonment was not necessary to consummate the act of rape, as it is clear that the rape was completed before the defendant attempted to remove or confine the victim unlawfully. Moreover, the victim's movement from a public road to a vehicle, if accomplished, would have both prevented the victim from summoning help and lessened the defendant's risk of detection. For these reasons, we conclude that the trial court did not err in failing to merge the attempted false imprisonment charge into the charge of rape.

Next, we are to determine whether the trial court erred in failing to merge the defendant's sexual battery conviction with the conviction for rape. We initially note that while "'separate acts of intercourse may be so related as to constitute one criminal offense, generally rape is not a continuous offense, but each act of intercourse constitutes a distinct and separate offense.'" Id. (quoting 75 C.J.S. Rape § 4 (1952 & Supp. 1995)). Additionally, the following factors aid in the determination of whether sexual offenses in particular are multiplicitous:

(1)     The nature of the act;
(2)     The area of the victim's body invaded by the sexually assaultive behavior;
(3)     The time elapsed between the discrete conduct;
(4)     The accused's intent, in the sense that the lapse of time may indicate a newly formed intent to again seek sexual gratification or inflict abuse; and
(5)     The cumulative punishment.

Id. at 665.

The record reflects that the defendant forced the victim to perform oral sex on him on two occasions, which together formed the basis for Count One. After unsuccessfully attempting to force the victim into his vehicle, the defendant removed the victim's clothing and performed oral sex on her, with this episode forming the basis of Count Two. The nature of these acts is certainly distinct, as they required different body positioning and invaded different areas of the victim's body.

Furthermore, while there was not a substantial amount of time between the acts, we are persuaded that sufficient time passed between them so as to constitute separate offenses. See State v. Reginol L. Waters, No. M2001-02682-CCA-R3-CD, 2003 Tenn. Crim. App. LEXIS 82 (Tenn. Crim. App., at Nashville, Jan. 30, 2003) (the defendant's conduct constituted two separate and distinct offenses of aggravated rape after the evidence showed that the defendant forced the victim to perform fellatio on him twice, five minutes apart); State v. Barney, 986 S.W.2d 545 (Tenn. 1999) (aggravated sexual assault and rape of a child were discrete acts justifying separate convictions in part because "although close in time, [the acts] were not performed simultaneously").

Finally, because the evidence establishes three separate crimes, the defendant has not received multiple punishments for the same offense. Therefore, it is our determination that the acts were discrete and that the trial court did not err in failing to merge the sexual assault conviction with the conviction for rape.

III.  Denial of Alternative Sentencing

This court's review of the sentence imposed by the trial court is de novo with a presumption of correctness. T.C.A. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is de novo. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

The burden is upon the appealing party to show that the sentence is improper. T.C.A. § 40-35-401(d), Sentencing Commission Comments. In conducting our review, we are required, pursuant to Tennessee Code Annotated section 40-35-210(b), to consider the following factors in sentencing:

(1) [t]he evidence, if any, received at the trial and the sentencing hearing; (2) [t]he presentence report; (3) [t]he principles of sentencing and arguments as to sentencing alternatives; (4) [t]he nature and characteristics of the criminal conduct involved; (5) [e]vidence and information offered by the parties on the enhancement and mitigating factors in §§ 40-35-113 and 40-35-114; and (6) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

Under the Criminal Sentencing Reform Act of 1989, trial judges are encouraged to use alternatives to incarceration. An especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary. T.C.A. § 40-35-102(6).

In determining if incarceration is appropriate, a trial court may consider the need to protect society by restraining a defendant having a long history of criminal conduct, the need to avoid depreciating the seriousness of the offense, whether confinement is particularly appropriate to effectively deter others likely to commit similar offenses, and whether less restrictive measures have often or recently been unsuccessfully applied to the defendant. T.C.A. § 40-35-103(1); see also State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

A court may also consider the mitigating and enhancing factors set forth in Tennessee Code Annotated sections 40-35-113 and -114 as they are relevant to the section 40-35-103 considerations. T.C.A. § 40-35-210(b)(5); State v. Boston, 938 S.W.2d 435, 438 (Tenn. Crim. App. 1996). Additionally, a court should consider the defendant's potential or lack of potential for rehabilitation when determining if an alternative sentence would be appropriate. T.C.A. § 40-35-103(5); Boston, 938 S.W.2d at 438.

There is no mathematical equation to be utilized in determining sentencing alternatives. Not only should the sentence fit the offense, but it should fit the offender as well. T.C.A. § 40-35-103(2); State v. Batey, 35 S.W.3d 585, 588-89 (Tenn. Crim. App. 2000). Indeed, individualized punishment is the essence of alternative sentencing. State v. Dowdy, 894 S.W.2d 301, 305 (Tenn. Crim. App. 1994). In summary, sentencing must be determined on a case-by-case basis, tailoring each sentence to that particular defendant based upon the facts of that case and the circumstances of that defendant. State v. Moss, 727 S.W.2d 229, 235 (Tenn. 1986).

We initially note that the defendant was convicted of a Class B felony, a Class E felony, and a Class B misdemeanor and was issued concurrent sentences. Based upon his conviction of a Class B felony, the defendant receives no presumption in favor of alternative sentencing. T.C.A. § 40-35-102(5). Thus, the State did not have the burden of justifying incarceration according to statutory provisions. See State v. Cortez D. Hubbard, No. W2004-01937-CCA-R3-CD, 2005 Tenn. Crim. App. LEXIS 943, at *5 (Tenn. Crim. App., at Jackson, Aug. 26, 2005). Furthermore, because the

B felony required 100% service and the remaining sentences were ordered concurrent, it is not necessary to address the denial of alternative sentencing in regard to the latter two offenses. These facts, taken with the trial court's explanation of its reasoning for denying alternative sentencing, affords the trial court's determinations a presumption of correctness. Id.

At the sentencing hearing, the presentence report was introduced and established that the defendant had a cash bond forfeiture on a worthless check in 2000, but had no convictions.[3] Michael Burton of the Board of Probation and Parole noted that the defendant had a "pretty decent work record," as he had been employed by the Cookeville Housing Authority and the Waffle House Restaurant. Additionally, four witnesses testified that the defendant would be amenable to probation, including two of the defendant's sisters and one brother. Both of the defendant's sisters further testified that they would help monitor the defendant's behavior if he were to be given probation. After hearing the proof, the trial court made the following findings:

> Well, I do not doubt what Mr. Judd and others – family members have testified, and I'm sure there are probably others there who would say the same thing. [The defendant's] prior record seems to be clean. I do not consider the worthless check a conviction in any way as a matter that would be held against him. Under Blakely, it would appear that only things admitted or prior convictions could be used. Maybe the worthless check is a – is technically a conviction, but not of some significance, it seems to me, to warrant an increased sentence for this rape charge.
>
> . . . .
>
> So, under the circumstances, I would impose a one year sentence for the aggravated – I mean for the sexual battery, and a six month sentence for the attempted false imprisonment, and they would run concurrent with the sentence in the rape charge. So, what are we going to do with the rape charge? And the record seems to be, as I say, clean, it would justify a minimum sentence of eight years.
>
> So, what do with do with – are we going to serve it, or are we going to suspend it and a split confinement of one year in jail? The fact that the jury reduced it from a charge of aggravated sexual battery down to – or, I mean, aggravated rape to a rape charge is something the jury has prerogative to do, but it is not necessarily controlling to this Court, nor should this Court then consider something, say, "Well, they reduced it, so, therefore, it's not as bad as it was."
>
> There's an allegation here of confrontations, or encounters, and those encounters are not denied. The question at trial was whether or not they were consensual, it seemed to me. If I remember what was said, "It just didn't happen like she said it happened." So, here we have an individual who's walking down the road

---

[3] Although the defendant admitted to a previous conviction for public intoxication at trial, no record of that conviction was found.

who is encountered by the accused, and all of a sudden she's coming onto him and they end up in the back seat of the car, or in the car. The jury didn't much believe that, and they found him guilty of rape. And maybe, for whatever reason, they reduced it to eight years. But the fact that they believed it and the Court accepted the verdict, it seems to indicate to me . . . that they didn't have much confidence in what you were saying about how it happened, and they found you guilty of rape, and they, as I said, reduced it from aggravated rape to rape, which is a serious offense.

The legislature has said that if one receives a sentence of that and has to serve it, they have to do it all. And the circumstances of this case are not so that it justifies some reduction of that sentence or something less than the eight years to serve. The facts were aggravated to the extent that we have a, what might be considered a casual encounter with someone, as opposed to maybe a – some family dispute, or a long time relationship that goes sours [sic], that somebody accuses another one of rape or aggravated rape. So, the circumstances of this case would justify a sentence of eight years, and that sentence to be served.

It is clear from the record that the trial court looked beyond the jury's verdict to the actual facts and circumstances of the offense, an appropriate practice when determining whether probation is proper. See State v. Mark A. Standifer, 1984 Tenn. Crim. App. LEXIS 2539 (Tenn. Crim. App., at Knoxville, July 30, 1984). In so doing, the court noted the defendant's lack of candor, as was evidenced by the jury's implicit rejection of the defendant's version of the incident. See State v. Bunch, 646 S.W.2d 158 (Tenn. 1983) (the defendant's lack of candor an appropriate consideration in the denial of probation). The evidence presented at trial established that the defendant approached the victim, a stranger, and raped and sexually battered her in broad daylight. In our view, the circumstances of this brazen attack, coupled with the defendant's lack of candor at trial was sufficient for the trial court to deny probation.

Conclusion

The judgments of the Putnam County Criminal Court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE