IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
December 20, 2005 Session

**STATE OF TENNESSEE v. PAUL O. DICKENS, SR.**

**Direct Appeal from the Circuit Court for Rutherford County**
**No. F-55117     James K. Clayton, Jr., Judge**

———————————

**No. M2005-00571-CCA-R3-CD - Filed February 15, 2006**

———————————

The defendant, Paul O. Dickens, Sr., was convicted by a Rutherford County jury of attempted voluntary manslaughter (a Class D felony), reckless endangerment (a Class E felony), and two counts of coercion of a witness (a Class D felony). On direct appeal to this court, the defendant contends that: (1) the evidence was insufficient to support the verdict; and (2) his convictions for attempted voluntary manslaughter and reckless endangerment violate the constitutional prohibition against double jeopardy. Upon review of the record, briefs of the parties, and applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID H. WELLES and ROBERT W. WEDEMEYER, JJ., joined.

Gerald L. Melton, District Public Defender, and Russell N. Perkins, Assistant Public Defender, for the appellant, Paul O. Dickens, Sr.

Paul G. Summers, Attorney General and Reporter; Seth P. Kestner, Assistant Attorney General; William C. Whitesell, Jr., District Attorney General; and Trevor H. Lynch and Thomas S. Santel, Jr., Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

Facts

At trial, Detective Phillip Loyd testified that he was employed with the Murfreesboro Police Department and that he was called to investigate the subject incident after a 911 call reported shots fired at the location. Upon arrival, he spoke with and took statements from the victim, Richard (Rick) Robinson; the victim's wife, Melinda Robinson; Angela Neal; and Matthew Neal. Detective Loyd stated that the victim showed him where gunfire struck the garage and a metal gate behind the house. He also noticed tire tracks in the ground, where it appeared that someone had "spun out."

Detective Loyd photographed the area and developed a crime scene sketch the following day. He further noted that he did not find any shell casings or buckshot upon a search of the area.

Detective Loyd testified that the distance from the impact on the gate to the impact on the garage was forty-six feet, four inches; that the distance from the ground to the impact on the gate was forty-four inches; and that the distance from the ground to the impact on the garage was between six and a half and seven feet. Detective Loyd explained that the tight pattern of shot on the gate indicated that the shooter was standing in close proximity and that the pattern on the garage was dispersed over a larger area. He stated that he saw the victim's dog and the defendant's dog on the scene and determined that there was evidence of a dog fight; photographs taken of the victim's dog documented injuries it sustained. Detective Loyd testified that during the course of the investigation, he requested that the defendant's phone conversations be copied.[1]

On cross-examination, Detective Loyd testified that he did not recall responding to that address previously. He acknowledged that the ground was wet and that the spin marks did not necessarily indicate that the driver of the vehicle left hurriedly. He stated that "smaller shot" was fired at the gate and garage but reiterated that he was unable to recover any embedded shot from either location. Detective Loyd admitted that he was "unsure if there were one or two shots [fired] because of the angle [from the gate to the corner of the garage]. "

On redirect examination, he testified that he was unable to determine whether the weapon was single or double barreled, or what load it contained because it was never recovered. On recross-examination, Detective Loyd testified that there was no evidence to definitively prove whether one or two shots were fired. On further redirect examination, he stated that the blast pattern on the gate indicated a straight shot.

Angela Neal, the victim's sister, testified that she and her husband went to visit the victim and his wife at 1208 Grantland Avenue in July 2003, in order to pay a debt of money owed by them to the victim. She stated that when they arrived, the defendant, whom they had known for ten years, was in an argument with the victim regarding their dogs. Mrs. Neal stated that the two men exchanged words and that the defendant went to his car and retrieved a gun from the trunk, stating that he would "just kill everyone." When the defendant began loading the gun, Mrs. Neal took her nephew (the victim's son), who was standing outside on the deck, inside the house. She stated that she then heard two shots and that the victim's wife, who was also in the house, phoned 911. When Mrs. Neal looked outside, the defendant was attempting to back out of the driveway but was blocked in by a vehicle owned by the victim's wife. The defendant yelled for someone to move the truck but when no one came outside, the defendant drove through the yard and left.

On cross-examination, Mrs. Neal testified that when she and her husband arrived, the victim was repairing the fence where his dog had escaped. She reiterated that she moved her nephew inside

---

[1] The record reflects that the phone conversations were made from the Rutherford County Detention Center and were, pursuant to policy, subject to monitoring and recording.

when the defendant announced that he was getting a gun, and that she heard gunshots after she went inside the house. Mrs. Neal testified that she could see the defendant through the window and the storm door in the back of the house. She indicated that, before the shots were fired, the defendant was making threatening statements to the victim, which the victim was ignoring. Mrs. Neal stated that after the defendant backed out of the driveway, he heard sirens; pulled back into the driveway; yelled to the victim's wife, "I know you called the police, you stupid bitch"; and then left. Mrs. Neal admitted that the defendant did not attempt to come inside the house or get out of his car again.

Matthew Neal, the victim's brother-in-law, testified that he and his wife went to the victim's home in July 2003. He stated that when they arrived they saw the defendant and victim arguing about a dog fight and that they heard the defendant threatening to kill the victim. The defendant then opened the trunk of his vehicle and retrieved a shotgun that was between eighteen and twenty-four inches in length. At that point, Mr. Neal got in his vehicle and backed out of the driveway as the defendant fired one shot. When he saw the victim running between two houses, he stopped and picked him up, and they drove down the street and made a loop before returning to the house.

On cross-examination, Mr. Neal testified that the defendant was standing in front of the garage when he shot. Mr. Neal stated that when he started his car, the radio was turned off and all four windows were down. He further stated that he heard one shot and that the victim sustained no injuries. On redirect examination, he recalled that before retrieving his gun, the defendant said, "Everybody is going to die."

The victim's wife, Melinda Robinson, testified that her mother lived next door on Grantland Avenue and that Angela and Matthew Neal and the defendant were present at her home in July 2003 when she and her daughter came home. She stated that as she exited the vehicle, she heard the defendant threatening to kill the victim and indicating that he was going to get a gun.

Mrs. Robinson testified that she and her daughter immediately went inside the house and that she saw the defendant shoot at the victim. She stated that her four children and Mrs. Neal were also inside the house when the gun was fired and that she subsequently phoned 911 to report the incident. Mrs. Robinson testified that the defendant made several attempts to leave before he was successful and, when he got to the end of the driveway, he stopped, yelled toward the house, got back in the vehicle, and left. Finally, she identified the voices of the defendant; the defendant's ex-girlfriend, Francine Wright; Wendell Webb, a friend of the defendant; and the victim on recorded phone conversations between the parties.

On cross-examination, Mrs. Robinson testified that she saw the defendant load one shell into the gun and shoot once at the victim but acknowledged that she did not know where the victim was when the gun was fired. She further admitted that neither Francine Wright nor Wendell Webb was present at the time of the incident. Mrs. Robinson acknowledged that the defendant's only statement to her regarding her testimony was made when she was listening in on a conversation between the defendant and her mother. On redirect examination, she testified that the defendant's statements to

her on the phone indicated that "when [the defendant] did get out [of prison], that he was going to do something."

The victim, Richard Robinson, testified that the defendant came to Grantland Avenue in July 2003 to leave his dog at the defendant's grandmother's house, which was next door to the victim's home. The victim stated that he was in the yard with his youngest son when the defendant arrived and that shortly thereafter, he heard his dog fighting with the defendant's dog and went around the fence to separate them. The defendant said "a few cuss words" as the victim retrieved his dog, and the victim told the defendant that he "[didn't] appreciate [the defendant] coming up here and doing that," in apparent reference to the defendant's dog's attack. The defendant, in turn, said that "he didn't do it, that he had had a bad day and he would kick [the victim's] ass, and [] said he would shoot [the victim]." During this time, Angela and Matthew Neal arrived at the house, as did the victim's wife and daughter.

The defendant walked to his vehicle, and Matthew Neal yelled "gun" and began backing out of the driveway in his vehicle. The victim saw the defendant retrieve the shotgun from his trunk and ran as the defendant fired the weapon. The victim testified that he ran around the neighbor's house and onto the street where he met Matthew Neal and got into the vehicle with him. He indicated that he did not see the defendant after he fired the gun but that he believed the defendant was firing at him because he hit the gate and wall near where the victim had been standing. The victim stated that he received a phone call from the defendant after the incident and that he was reluctant to testify because he "know[s] what kind of person [the defendant] is, [and] what he's capable of doing."

On cross-examination, the victim testified that after he heard the dogs fighting he went around the house, picked his dog up, and told the defendant he did not appreciate him allowing his dog to attack. The victim stated that the defendant got upset and began threatening as the victim walked toward him. When the defendant went to his vehicle to get the weapon, the victim turned to run and heard the impact of the shot. He reiterated that he ran around the neighbor's house and got in the car with Matthew Neal.

The victim acknowledged that he had only one phone conversation with the defendant after the incident and that the defendant did not threaten him during that conversation. He admitted that he heard the remaining conversations for the first time at the district attorney's office.

On redirect examination, the victim stated that, although the defendant did not personally threaten him during their phone conversation, he learned that the defendant had threatened him before hearing the tapes at the district attorney's office. On recross-examination, the victim admitted that he did not sustain any injuries from the incident and that the defendant never directly threatened him.

The defendant testified that he went to his mother's house on the day of the incident to leave his dog for a few days. He stated that when he let his dog out of the vehicle, the victim's dog attacked his dog. He further indicated that he attempted to get between the two dogs, both originally

bred for fighting, and that he was able to separate them after about "a minute and a half." The defendant stated that he saw the victim standing in the backyard, told the victim to "leave [him] alone," and proceeded to chain his dog and walk back to the car to unload dog food from the trunk. He recalled that words were exchanged between him and the victim, that an argument ensued, and that he went to his vehicle to get his shotgun because he thought the victim "was going to come around and jump on [him]." He stated that the victim's wife shouted that he had a gun and went inside the house, as the victim ran around the north end of the house.

The defendant indicated that he shot birdshot at the garage after the victim had gone around the corner of the house and that he put the shotgun back in the trunk and attempted to leave thereafter. After realizing that his vehicle was blocked in by the victim's wife's truck, the defendant cut through the yard and came out onto the street.

The defendant identified the voices on the recorded phone conversations as Francine Wright, Wendell Webb, the victim, and his mother. He acknowledged that the threat he asked his mother to convey "[didn't] sound good" but stated that it is a "figure of speech meaning that you're really mad." He further stated that when he stated that he would "shoot all of them" when he got out, he was "just upset," and further testified that he "say[s] things when [he is] upset that don't mean a hill of beans." The defendant testified that when he spoke with the victim he was trying to get him to "tell the truth." He indicated that his intent in firing the gun "was to scare [the victim] so he wouldn't come around the house and jump on [him] or get in a fight." The defendant further recalled that he did not point or fire the gun at anyone in particular. He admitted that the shotgun "got thrown away" after the incident. Finally, he acknowledged prior convictions for theft over $500, burglary, third degree burglary, non-habitation burglary, theft under $500, and criminal impersonation.

On cross-examination, the defendant reiterated that he wanted the witnesses to tell the truth. He admitted that he was initially going to deny having a shotgun and say that he had fireworks. He stated that he made the threats on the phone because he was angry and was "talk[ing] crazy." The defendant testified that he was not under the impression that Wright was going to convey the message to the witnesses. He stated that the told Wright and Webb to take the shotgun "swimming" or dispose of it, because he "didn't need it to be around anywhere." Finally, the defendant testified that he was thinking clearly and knew what he was doing while at the victim's house.

Analysis

I. Sufficiency

The defendant contests the sufficiency of the evidence to support his convictions for two counts of coercion of a witness. When an accused challenges the sufficiency of the evidence, this court must review the record to determine if the evidence adduced during the trial was sufficient "to support the finding by the trier of fact of guilt beyond a reasonable doubt." Tenn. R. App. P. 13(e). This rule is applicable to findings of guilt predicated upon direct evidence, circumstantial evidence,

or a combination of direct and circumstantial evidence.  State v. Brewer, 932 S.W.2d 1, 18 (Tenn. Crim. App. 1996).

In determining the sufficiency of the evidence, this court does not reweigh or reevaluate the evidence.  State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Nor may this court substitute its inferences for those drawn by the trier of fact from circumstantial evidence.  Liakas v. State, 286 S.W.2d 856, 859 (Tenn. 1956).  To the contrary, this court is required to afford the State the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence.  State v. Elkins, 102 S.W.3d 578, 581 (Tenn. 2003).

The trier of fact, not this court, resolves questions concerning the credibility of the witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence. Id.  In State v. Grace, the Tennessee Supreme Court stated, "[a] guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State."  493 S.W.2d 474, 476 (Tenn. 1973).

Because a verdict of guilt removes the presumption of innocence and replaces it with a presumption of guilt, the accused has the burden in this court of illustrating why the evidence is insufficient to support the verdict returned by the trier of fact.  State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982); Grace, 493 S.W.2d at 476.  The offense of coercion of a witness is codified at Tennessee Code Annotated section 39-16-307, and states the following in pertinent part:

> A person commits an offense who, by means of coercion, influences or attempts to influence a witness or prospective witness in an official proceeding with intent to influence the witness to:
> > (1) Testify falsely;
> > (2) Withhold any truthful testimony, truthful information, document or thing; or
> > (3) Elude legal process summoning the witness to testify or supply evidence, or to be absent from an official proceeding to which the witness has been legally summoned.

Further, coercion is statutorily defined as "a threat, however communicated, to . . . [c]ommit any offense."  T.C.A. § 39-11-106(a)(3)(A).

The following telephone conversations were recorded and presented at trial:

Defendant: Uh, would you give [the victim] a message for me?

Wright: Yeah.

Defendant: Tell him, and any of those other mother f--kers that say, are supposed to be witnessing for him, if they don't go up there and tell them it was

fireworks, that when I do get out in ten years or however long it is that I'm coming after 'em. Will you do that for me?

Wright: Yeah, I'll tell 'em.

Defendant: You tell him if he gets up there and, uh, says anything but fireworks, I will come after him and any of those other mother f--kers that's supposed to be the witnesses.

Wright: Okay.

[End of recording].

Defendant: Call and let [the victim] know, uh, you talked to me, uh, if they don't go up there and say it was fire - they realized it wasn't a shotgun, it was fireworks.

Wright: Yeah, 'cause you don't even own a shotgun.

Defendant: That's right. Tell 'em I had one of those, uh, wall pistols out and, uh, some M-80's, tryin' to scare the dogs. You know.

Wright: Yep.

Defendant: So . . . it's . . . I don't know, it's f--ked up.

[End of recording].

Defendant: Have you - you ain't had a chance to have a little talk with [the victim], have you?

Wright: No. Not yet.

Defendant: Well, when you go over there, you know, to give Mom the title to get the car . . .

Wright: Yeah.

Defendant: I guess she's comin' in this afternoon, ain't she?

Wright: Yeah.

Defendant: Well, kinda have a talk with him.  Tell him, hey, if they make you come up there, you tell 'em where you thought, uh, was a shotgun but, uh, you don't know for sure.  It might have been, uh, fireworks.

Wright: Okay.

Defendant: And, uh, tell him he better tell 'em that, 'cause when I get out, he knows how I am.  He knows I'm crazy.  If I have to do some time over this bull shit, I-I'll be one of the craziest mother f--kers you ever seen.

Wright: I bet.

Defendant: You know that.  He knows that.  Everybody that knows me knows that.

Wright: Uh-huh.

[End of recording].

Defendant: Did, uh, you happen to say anything to [the victim] about what I said?

Wright: I haven't seen [the victim].

Defendant: Oh.

Wright: But I will here in a few minutes, 'cause when I get off the phone with you I'm goin' to see Granny, 'cause I told her I'd come over there right after I got out of court with you.

Defendant: Oh.  Ah, but, uh, yeah.  Uh, you needin', uh, kinda sent it to Melinda, 'cause Melinda will tell him.

Wright: Oh, I know.

Defendant: Tell 'em it was just fireworks, and I don't want to hear no shit out of 'em.

Wright: Exactly.  I told Granny that.

Defendant: Yeah.

Wright: And, uh, Granny said, uh, that, well . . . we'll talk about what Granny said some other time.

Defendant: Yeah. Uh . . .

Wright: But she said that, uh, she knew ya'll had fireworks up here.

Defendant: Was. Those M-80's was bad mother f--kers.

Wright: Yep.

Defendant: Excuse my language, but they are.

Wright: (laughing) Yep, they are.

Defendant: Yeah, I was . . . knew I shouda just turned Tiger loose on that son of a bitch. No, I shouldn't of, 'cause they'd put him to sleep then.

Wright: Yeah, they definitely woulda.

Defendant: Then I'd really by pissed.

Wright: Well, they wouldn't have put him to sleep as . . . well, yeah . . . .

Defendant: Yeah.

Wright: . . . they'd claim he was a vicious dog.

Defendant: (laughing) Aw, he can (unintelligible).

Wright: Only toward men.

Defendant: (laughing) Well . . . .

Wright: A man shouldn't have abused him. And [the victim] knows that. Everybody knows that.

[End of recording].

Defendant: Uh, has [the victim] planned on pressin' charges or what?

Mother: He said he wasn't, but the State done, ah, told him that they was, ah, what they was gonna do, they'd subpoena him to court.

Defendant: Aw, if he'll just tell 'em it was fireworks and stick at that they can't do nothin'.

Mother: They've got the buckshot, son.

Defendant: It don't matter if he'll, uh, still say, uh, what I done was, uh, fire . . . so, in other words, I'm gonna wind up with twenty years out of this shit, ain't I?

Mother: Son, I can't help 'ya.

Defendant: Well, that son of a bitch will when I get out, and I can guarantee you f--kin' that.

Mother: And, uh, them people across the street seen it.

Defendant: What people?

Mother: Over there, lived in that house across the street. They was out there in the yard drinkin' beer.

Defendant: Well they's so drunk they don't know what they seen. Uh . . . .

Mother: Matt and, uh, Angela.

Defendant: I tell 'ya what, uh, you can tell 'em, if I do any time, when I get out I'm gonna, ah, shoot all of 'em.

Melinda Robinson: You ain't gonna shoot no mother f--kin' body 'cause you're the one who f--kin' did it, Gibb!

Defendant: F--k you, whore!

Melinda Robinson: No, my kids were out there goddammit!

Defendant: F--k you, whore!

Melinda Robinson: No, f--k you, Gibb!

Defendant: Um . . . .

[End of recording].

Wright: Go on over there.

Defendant: Sis, uh, I tell you what, uh, I get any time outta this, I'm gonna . . .

-10-

Wright: She was at Granny's when I called.

Defendant: Yeah.

Wright: She just picked up the phone, too.

Defendant: Oh, being nosey . . . again.

Melinda Robinson: No, I wasn't being nosey.

Defendant: Evidently you are.

Melinda Robinson: No I'm not.

Defendant: No, you - I'll tell you what . . .

Melinda Robinson: This is my mother f--kin' business 'cause my f--kin' kids were out there, Gibb!

Defendant: No - you'd done took 'em in the house before I'd done anything. Now damn it, you know damn good and well they was already in the f--kin' house.

Melinda Robinson: Whatever, Gibb. I hope . . .

Defendant: And [the victim's] done around the goddamn house.

Melinda Robinson: . . . I hope you spend the rest of your f--kin' life in there!

Defendant: I tell you what you little f--kin' bitch!

Melinda Robinson: What?

Defendant: You better hope I don't get out no time soon!

Melinda Robinson: I ain't scared of you, Gibb!

Defendant: Okay. I don't want you to be scared.

Melinda Robinson: I wish you would f--kin' kill me!

Defendant: Uh-huh . . . okay. Momma . . .

Melinda Robinson: What's she gonna do, Gibb?

Defendant: Mom.

Melinda Robinson: She ain't takin' up for your ass no more!

Defendant: Mom . . . mom, you still there? Hello?

Wright: I hung them up.

Defendant: Uh, I tell you what - I'm gonna f--k 'em up.

Wright: That don't – no that don't need to be on the telephone.

Defendant: I'm gonna f--k 'em up.

Wright: That's why I hung it up.

Defendant: Well . . . .

Wright: I didn't know she would pick up the phone and listen. But she does have . . . I didn't even think about her havin' that cordless she hooked up over there, 'cause she had her cell phone cut off.

Defendant: There wasn't even anybody outside when that shit happened, Francine. I mean . . . I knew what in the hell I was doin'.

Wright: See Granny tells her she wasn't there - she ain't go nothin' in it.

[End of recording].

Defendant: Mom?

Mother: What?

Defendant: What is Melinda's friggin' problem?

Mother: I don't know.

Defendant: You need to tell her to stay the hell off of me, I will hurt her.

Mother: Well . . .

Defendant: I love her to death, but by God I ain't gonna put up with no shit.

Mother: (coughing)

Defendant: You know that. Hello?

[End of recording].

Defendant: Well, tell him when he goes up to the court to tell the judge he does not want to press charges - that I did not shoot at him - that I shot at a gate.

Wright: Okay.

Defendant: That I did not shoot at him.

Wright: Okay.

Defendant: That a'way the most they can charge me with is reckless endangerment.

Wright: Yep.

Defendant: There's, uh, I'm serious Francine. All the kids done been yanked inside the house.

[End of recording].

Victim: Hello?

Defendant: Hello.

Victim: What's up?

Defendant: What's goin' on, man?

Victim: Ah, ridin' them roads, man, workin' deliverin' these cars, man.

Defendant: Okay.

Victim: What you up to?

Defendant: Aw, sittin' here in this jail.

Victim: I heard that shit.

Defendant: Hey man, I want to apologize to you about that shit.  Ah . . .

Victim: That's fine, man, I . . .

Defendant: I had a bad day that day - I did not shoot at you, man.  I don't waited until you's went around the house, and then, I popped a cap, okay?  I mean, I didn't shoot at you.  You there?

Victim: Yeah, I'm here.  I'm listening to you.

Defendant: Huh?

Victim: I'm listening to you - go ahead.

Defendant: But yeah - I waited, I mean I, Melinda done yanked all the kids off the damned patio out there, and you'd done stepped around the corner of the house towards the front and I popped that gate there, uh, across your backyard.  See, and as far as me, uh, I didn't put, uh, uh, Tiger on Barney.  I didn't know Barney was out of the pen.  I was unloadin' Tiger to chain him up back there by the car.

Victim: Yeah.

Defendant: And Barney came runnin' around there an jumped on Tiger, and you know Tiger - he just turned and, uh, and went eatin' on, uh, Barney.  And I got out there and I was kickin' 'em apart and shit.

Victim: Yeah.

Defendant: Now I got 'em apart as quick as I could get 'em apart.  But, ah, I didn't shoot at you, man.

Victim: Well, I don't know what you want to do, man, or what the f--k to say.  I talked to the detective last night, and he told me that, he told me that, uh.  I talked to him, I said, what' the deal with what's goin' on right now?  He said, well you ain't gonna have to do nothin' - the State's picked it up.  The State's gonna prosecute him.

Defendant: Uh . . .

Victim: I said, so I'm out of it?  He said, yeah, he said far as I'm concerned, I ain't, I don't even need you no more.

Defendant: Though, uh, they can't, without you testifying, they can't do that shit, I mean.

Victim: Yeah.

Defendant: If they do make you testify, just say hey he didn't - did not shoot at me. I might even call you up there for a witness saying hey, he didn't shoot at me. Uh, I mean, the worst they can get me for is a reckless endangerment.

Victim: Yeah.

Defendant: For, uh, shootin' and hittin' Ms. Berry's house over there. I guess I hit her house, didn't I?

Victim: Yeah, you hit her house, garage, window.

Defendant: Damn.

Victim: Yeah.

Defendant: I . . .

Victim: But, uh . . . hell, I just did, I just stepped around that corner and heard all that shit hit the f--kin' side of that garage, dude.

Defendant: Well . . .

Victim: I mean, I just did, if I - if I had been a split second later you woulda got me.

Defendant: Naw, I seen 'ya when - I watched when you stepped around that corner's when I pulled that trigger . . . I, I mean . . .

Victim: Yeah. But it was pretty goddamn close. It was enough to scare the hell out of me - I'll put it to you like that.

Defendant: Aw, any time you get shot at it scares the hell out of you. Look how many times I been shot at.

[End of recording].

On appeal, the defendant contends that the evidence is insufficient to support his convictions for two counts of coercion of a witness because it failed to establish that the threats were communicated to the victim and the victim's wife. However, the record reflects that the victim's

wife overheard a conversation between the defendant and his mother, in which the defendant said, "I tell 'ya what . . . you can tell 'em, if I do any time, when I get out I'm gonna . . . shoot all of 'em." This statement, although not directed at the victim's wife, was a communicated threat to commit an offense. The tape recordings further establish that the defendant directly threatened the victim's wife in a later conversation when he said, "You better hope I don't get out no time soon!" This statement, taken in context with the conversation as a whole, was also sufficient to support his conviction for coercion of a witness.

Furthermore, although the defendant did not directly threaten the victim in their sole phone conversation, the victim testified that he learned of the defendant's threats prior to hearing the conversations at the district attorney's office. The victim further indicated the gravity of the threats when he stated that he was reluctant to testify because he "[knew] what kind of person [the defendant was], [and] what he [was] capable of doing." In our view, the mere fact that the defendant utilized a third party to transmit the threats does not alter our conclusion that the threat was communicated, albeit indirectly. Therefore, it is our determination that the evidence presented was sufficient to establish that the defendant communicated threats to commit an offense to both the victim and the victim's wife.

## II. Double Jeopardy

The defendant also contends that his convictions of attempted voluntary manslaughter and reckless endangerment violate constitutional prohibitions against double jeopardy. The double jeopardy clauses of both the United States and Tennessee Constitutions state that no person will be twice put in jeopardy of life or limb for the same offense. U.S. Const. amend. V; Tenn. Const. art. I, § 10. Included in its protections are the following: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." State v. Phillips, 924 S.W.2d 662, 664 (Tenn. 1996) (citations omitted). The issue before us relates to the last of the three categories as the defendant contends that two convictions resulted from the same act.

Our supreme court set out a four-part test that must be utilized in determining whether a defendant has received multiple punishments for the same act:
(1) The statutory elements of each offense;
(2) The evidence used to prove the offense;
(3) Whether there were multiple victims or discrete acts; and
(4) The purposes of the respective statutes.
State v. Goodwin, 143 S.W.2d 771, 781 (Tenn. 2004)(citing State v. Denton, 938 S.W.2d 373, 381 (Tenn. 1996)).

Applying the test to the case at hand, we must first determine whether each offense requires proof of an element the other does not. See Blockburger v. United States, 284 U.S. 299, 304, 52 S. Ct. 180 (1932). The offense of attempted voluntary manslaughter requires that the defendant

intentionally or knowingly attempt to kill the victim as a result of adequate provocation, sufficient to lead a reasonable person to act in an irrational manner. See T.C.A. §§ 39-13-211(a); 39-12-101(a)-(b). Felony reckless endangerment results when a defendant engages in reckless conduct, with a deadly weapon, that places or may place another in imminent danger of death or serious bodily injury. See T.C.A. § 39-13-103. Certainly, attempted voluntary manslaughter requires proof that the defendant intended to kill the victim and that the defendant's act was a result of provocation, neither of which is required to prove reckless endangerment. Further, reckless endangerment requires proof of reckless conduct while attempted voluntary manslaughter does not. Therefore, each offense requires proof of a fact that the other does not.

Next, we are to determine whether the same evidence is required to prove both offenses. See Duchac v. State, 505 S.W.2d 237, 239 (Tenn. 1973). To prove the offense of attempted voluntary manslaughter, the State had to prove that the defendant intentionally or knowingly shot at the victim after provocation, believing that the conduct would result in the victim's death. By contrast, to prove felony reckless endangerment, the State had to prove that a person or class of persons was in the zone of danger; that the defendant placed those individual(s) in imminent danger of death or serious bodily injury; and that the defendant used a deadly weapon. Therefore, different evidence was necessary to prove each offense.

Third, we must analyze whether there were multiple victims or discrete acts. Upon review, we note that the indictment for Count One (voluntary manslaughter) lists Richard Robinson as the victim, while Count Two (reckless endangerment) did not name a specific victim. However, a review of the State's closing argument reflects that the victims of the felony reckless endangerment charge were the individuals inside the house at the time of the shooting, to wit: Melinda Robinson, Angela Neal, and the Robinson's four children. Therefore, the offenses involved differing victims.

As the final step in our analysis, we are to look to the purposes of the statutes. First, attempted voluntary manslaughter seeks to address intentional or knowing conduct resulting from provocation, which could have resulted in the victim's death. On the other hand, the felony reckless endangerment statute seeks to deter reckless conduct that creates a risk of death or serious bodily injury to third parties.

Upon consideration of the foregoing factors, we conclude that the defendant's convictions of attempted voluntary manslaughter and felony reckless endangerment do not violate the prohibitions against double jeopardy. Indeed, the statutes are distinct; differing evidence is required to prove each offense; and each has separate victims.

Conclusion

The convictions of the Rutherford County Criminal Court are affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

-17-